**IN THE UNITED STATES DISTRICT COURT**
**EASTERN SECTION OF TENNESSEE**

DOUG AND MIKA RACE,

     Plaintiffs,

v.                                                                                    Civil Action No.: 3:25-cv-00034
                                                                                     JURY DEMANDED.
CITY OF PIGEON FORGE, TENNESSEE,
MAYOR DAVID WEAR, in both his official and
personal capacities, APPALACHIAN SPRINGS LLC,
DAVID WEAR, KEESHA WEAR, JOHN WEAR,
RICHARD PERRY, AND DEBBIE PERRY as well
as all other Defendants not yet known to the Plaintiffs at this time,

     Defendants.

## FIRST AMENDED COMPLAINT

Plaintiffs, through the undersigned counsel, hereby submit this Complaint for damages for

violations of federal constitutional rights and in support of the same would set forth the following:

## PARTIES

1. The plaintiffs are married and reside in Ohio.

2. The Defendant, the City of Pigeon Forge, is a municipality located within the bounds

   of Sevier County, Tennessee.

3. Defendant Mayor David Wear is the Mayor of the City of Pigeon Forge and is its

   chief executive officer. Mr. Wear is believed to be a resident of Sevier County,

   Tennessee, and the Vice President of Operations at The Island in Pigeon.

4. Forge.

5. Defendant Appalachian Springs LLC is a registered Tennessee limited liability

   company and is a campground located in the City of Pigeon Forge and can be served

   at its registered agent 620 Mabry Hood RD STE 201, Knoxville, TN 37932.

6. Defendant Keesha Wear is the wife of David Wear and is believed to be a resident of Sevier County, Tennessee.

7. Defendant John Wear is the brother of David Wear and a member of Defendant Appalachian Springs LLC and Signature Development LLC and is believed to be a resident of Sevier County, Tennessee.

8. Defendant Richard Perry, a certified public accountant and a member of Appalachian Springs LLC is believed to be a resident of Blount County, Tennessee.

9. Defendant Debbie Perry is a member of Appalachian Springs LLC and is also thought to be a resident of Blount County, Tennessee.

## JURISDICTION AND VENUE

10. Both jurisdiction and venue are proper before this Honorable Court as the Plaintiffs are completely diverse from the Defendants. 28 U.S.C. §§ 1331, 1332 and 1344. In addition, jurisdiction and venue are proper before this Court as this matter involves a federal question. 28 U.S.C. § 1331. This Court also has authority to review state law under 28 U.S.C. § 1367.

## FACTS GIVING RISE TO CAUSE OF ACTION

### A. THE PROPERTY

11. On July 26, 2006, Frank Wear Jr passed on and left several properties to his children including his son Tommy Wear who inherited the home located at 362 Ogle Drive, Pigeon Forge, Tennessee, 37863. Unfortunately, in 2013, Mr. Wear fell on hard times and the home was foreclosed on. Adele Russell purchased the home from the bank and in 2015 sold the property to Barbara McWhorter. The property shared a driveway with 370 Ogle Drive.



**Exhibit A.**

12. The dream of the family was to always build a campground, however, in 2009, the Defendants David and John Wear signed a Cross Default and Cross Collateralization Agreement for the properties located at 402 and 410 Ogle Drive with Mountain National Bank and in 2016 the bank foreclosed on the properties. **Exhibit B**.

13. On December 15, 2016, Goodale Boyd Family Partners LTD, a Texas Limited Partnership (hereinafter "Goodale") purchased 402 and 410 Ogle Drive and in addition, on April 20, 2017, Goodale purchased the home located at 370 Ogle Drive.

14. Despite Goodale purchasing the 370 Ogle Drive, Defendant Richard Perry filed a Warranty Deed for the property depicted below in blue which included the home and the shared driveway on November 20, 2018.



15. On March 20, 2019, Goodale pulled a permit with the City of Pigeon Forge to pour the foundation for a six-bedroom cabin. **Exhibit C**.

16. On August 8, 2019, Defendant Richard Perry, formed Appalachian Springs LLC, a Tennessee Limited Liability Company whose members include the Defendant's John Wear, David Wear, Richard Perry, and Debbie Perry.

17. On November 20, 2019, Appalachian purchased the three tracts, 402, 410, and 370 Ogle Drive from Goodale. **Exhibit D**.

18. On January 23, 2020, Signature Development LLC a Tennessee limited liability corporation owned by Defendants David and John Wear, pulled a permit to demolish the home located at 370 Ogle Drive.

19. Further, at some point, the City of Pigeon Forge also rezoned the property to be C-6.



All rights reserved

20. On October 27, 2021, Appalachian Quitclaimed 1.3 areas of the land to Defendant Keesha Wear adding 1.3 acres to her and David Wear's residence. **Exhibit E**

21. On April 26th, 2025, Appalachian held a grand opening of the campground advertising that they are located in the "ideal location, offering the perfect blend of convenience and tranquility." https://appalachiansprings.com/accommodations/ .

## B. CONSPIRACY TO DEFRAUD THE RACES

22. On August 17, 2022, Doug and Mika Race (hereinafter "The Races) closed using Smoky Mountain Title Company.[1] (hereinafter "SMTC") on their investment property located at 362 Ogle Drive, Pigeon Forge, Tennessee 37863. The property was zoned

---

[1] The Plaintiffs purchased title insurance from Fidelity National Title Insurance Company.

C-6 and located within walking distance of the parkway in Pigeon Forge, a major tourist attraction.

23.  The property was in disrepair including needing a new roof and necessary upgrades in order to be able to enter the overnight rental market and the Races and their family members spent months traveling back and forth from their home and family business located in Chillicothe Ohio.

24. Upon information and belief, Defendant Wear had the Race's neighbor call them on March 6, 2023, and stated that she had been watching them for months and that in October of 2021, she had attended a meeting regarding where a road would be placed and that the Race's property would be demolished.

25. The Races, obviously stunned, drove immediately to City Hall where the Assistant City Manager, Eric Brackins, restated this lie.

26. Mr. Brackins stated that in October of 2021, he had personally hung door hangers on the doors of the residents including the previous owner's door, Barbara McWhorter, and that it depicted the road going through the Race's property.  However, the door hanger does not show that the road was to go through the Race's home nor did the "Public Notice Flyer".  **Collective Exhibit F.**

27. Mr. Brackin also stated that the Race's "negotiator," Ed Crook of Crook & Company would be contacting them soon to start the negation process.

28. The Races questioned why they had been able to purchase the home and why there was not a *lis pendens* filed which is mandated if the property was to be condemned.

29. To wit, the Mountain Press, a local newspaper, published the following drawing in 2021 depicting three different routes for the Westside Connector.  It is important to note none

of the three roads would have required the Race's property to be demolished. However, all three would have affected the Appalachian campground one of the three would have affected Defendant David Wear's rental property located at 912 Bud Lane, Pigeon Forge, Tennessee.



30. In a newly discovered October 28, 2021 email exchange, it was Mr. Brackins who asked the engineer to meet with Defendant John Wear regarding the campground being built on the Westside Connector route. **Exhibit G**.

31. On the same date, The Mountain Press, also reported that Mayor Wear had told the residents that he did not have a financial interest although his brother did in where the Westside Connector would be located which was patently false since Defendant David Wear was a member of Appalachian and also listed on the loan documents. **Exhibit H.**

32. Further, the Plaintiffs have recently discovered the Appalachian Storm Water Pollution Prevention Plan prepared for Signature Development, LLC, and submitted for 370 Ogle

Drive, Pigeon Forge, Tennessee. The document clearly shows that the Race's property would be needed for their campground. **Exhibit I.**

33. On March 7, 2023, Mrs. Race called Mayor Wear and recorded the phone call. Mayor Wear lied throughout the phone call stating that the old homeowner knew that the property was to be condemned, that the map depicting the Westside Connector showing the road going through the property had been hanging in City Hall, the City had received the federal funds for the Westside Connector years prior and much more. **EXHIBIT J -DESKFILED.**

34. To Wit the map that was displayed in the City Hall did not show that the road would go through the Race's property until 2023 when the City of Pigeon Forge had CDM Smith change in on the CAD program. However, upon information and belief, and despite the City of Pigeon Forge receiving millions of dollars from the federal government the Westside Connector will not be built and cannot be built where CDM Smith's drawing depicts it.

35. Believing that the Westside Connector location had not been decided upon the Races began to attend meetings and reach out to the other City of Pigeon Forge residents who also believed that there had not been a decision nor did the residents want the road which they believed would cause more traffic through what was supposed to be a *residential* area.

36. The Races started posting on social media platforms including YouTube, Instagram, Facebook, and TikTok regarding their plight with the City of Pigeon Forge and immediately both the City of Pigeon Forge and David Wear attempted to silence the Plaintiffs. Further, Defendant David Wear would unlawfully delete the Races'

comments and other residents' comments regarding the campground.  For example on

May 27, 2024, Felicia Fifield posted;

> "Where are the other 6 comments that have been deleted on this post?  I hope you aren't illegally deleting comments."

Yet, another example posted by Lisa Armstead;

> " The mayor or whomever is controlling his page are violating the 1st amendment rights, they CANNOT delete comments.  Keep in mind, SCOTUS has already ruled on this."

**Collective Exhibit K**.

37. Defendant David Wear was elected to be the Mayor of the City of Pigeon Forge (hereinafter "Pigeon Forge") in 2011.  Pigeon Forge operates under the City Manager-Commission Charter *Tenn. Code § 6-19-101*[2].  The Charter provides for a board of city commissioners under *T.C.A. § 6-20-201*. The board either elects one of its members as the mayor or the mayor is popularly elected to a designated commissioner position on the board.  *Tenn. Code Ann. § 6-20-209*. However, the commissioners can act officially only by a majority vote of the board.  Further, a municipal corporation is not entitled to acquire a fee in land by condemnation where it already has an easement that is sufficient for the purpose needed.  *Madisonville v. Cagle*, *159 Tenn. 600, 21 S.W.2d 385 (1929).*

38. The city charter requires that specified acts be taken through the adoption of an ordinance, the city has no authority to alter the manner of acting, and reliance on a general provision of the charter cannot excuse its failure to conform to the specific or express requirements of the charter, which are considered mandatory. "The rule . . . is, if the power to pass ordinances upon any specific subject is given, the power so granted

---

[2] The UT Municipal Technical Advisory Service has now unlawfully listed the City of Pigeon Forge's Charter as being formed under the General Law Manager-Commission T.C.A. § 6-18-101 et seq. which is not true. https://www.mtas.tennessee.edu/system/files/codes/combined/PigeionForge-code.pdf .

cannot be enlarged or changed by the general clause . . . "*Mayor and City Council of Nashville v. Link*, *80 Tenn. 499, 508 (1883)*. For the city to ignore the distinction drawn by a charter between a resolution and an ordinance results in the act being *ultra virus*. E.g., *Terry v. Commissioners of Cookeville, 184 Tenn. 347, 198 S.W.2d 1010 (1947).*

39. The City of Pigeon Forge acted *ultra vires,* and any Orders should be void. Undersign counsel for the Races recently received multiple documents from Pigeon Forge due to an Open Records Request (herein "ORR"). Pigeon Forge provided a photocopy of a door hanger which was purported to have been placed on each property along the route that "could be impacted" and in general states that Pigeon Forge would hold a public meeting on Tuesday, October 26, 2021, from 5:00 PM to 7:00 PM, and that the purpose of the meeting was to discuss the construction of a north-south local road with sidewalks to provide a local route that is an alternative to the Parkway and better serve the residents of Pigeon Forge". The door hanger also depicted a map of the "general project location." In the ORR, Pigeon Forge edited several documents to provide their account of what had occurred in 2021 adding the following:

> "9/27/2021 City Council Work Session, In addition to normal Media announcements for City Meetings, City staff placed door hangers on each property along the route that could be impacted, 10/21/2021. A public Meeting to accept Public Comments for the Westside Connector on 10/26/2021 (minutes below). City Council held another Work Session on 11/10/2021 to review the Public Comments and possible routes. City Council Meeting 11/22/2021 Voted to approve the attached engineering agreement and route."

40. While the General Assembly did not define what adequate notice means. The Tennessee Supreme Court, however, did address the issue in *Memphis Publ'g Co. v. City of Memphis, 513 S.W. 2d 511 (Tenn. 1974)*. In that case, the Court wrote:

> "We think it is impossible to formulate a general rule regarding what the phrase 'adequate public notice' means. However, we agree with the Chancellor that

adequate public notice means adequate public notice under the circumstances as would fairly inform the public."

*Memphis Publ'g Co.*, 513 S.W.2d at 513; *see also Kinser v. Town of Oliver Springs*, 880 S.W.2d 681 (Tenn. App. 1994).

41. In 1999, the Tennessee Appellate Court found that the town of Englewood had violated the Sunshine Act when the public announcement read: "Letter to State concerning HWY 411." The Court found "a more substantive pronouncement stating that the commission would reconsider which alternative to endorse for Highway 411 should have been given." *Englewood Citizens v. Englewood*, No. 03A01-9803-CH-00098 *(Tenn. Ct. App. Jun. 24, 1999).* However, that being said, it is notable that according to the Pigeon Forge Minutes for November 22, 2021, there was a vote to hire CDM Smith[3] for the Westside Connector for $1,093,000.

42. The meeting was about the town selecting the route for a road construction project – one would bypass the town or one that would widen a two-lane road into a four-lane road. The notice said: "Letter to the State concerning HWY 411." (This notice is so lacking that it arguably raises questions of motive on the part of the City). *T.C.A, 6-54-107(b).*

43. *Tenn. Code Ann. § 13-16-207 (f)* requires a local government to obtain the required certificate before filing its complaint. Further, the Complaint failed to comply with statutory requirements that the petition fully describe the project to be constructed and that the petition recites all the statutory authority for condemnation in addition the

---

[3] CDM Smith has a long and storied history including the fact that its subsidiary CDM Federal Programs Corporation agreed to pay $5.65 million to settle claims that they overcharged the U.S. Navy on two wastewater system contracts. The settlement resolved claims filed by Vincent Bevilacqua under the whistleblower provisions of the False Claims Act

Tennessee Legislature did not delegate the power of eminent domain to the City of Pigeon Forge.

44. In light of the directive in *Tennessee Code Annotated § 29-17-101* that the power of eminent domain should be used "sparingly" and be "narrowly construed so as not to enlarge, by inference or inadvertently, the power of eminent domain."

45. *Article 1, section 21* of the Tennessee Constitution states "[t]hat no man's . . . property [shall be] taken, or applied to public use, . . . without just compensation being made therefore." The Tennessee Supreme Court has construed *Article 1, section 21* of the Tennessee Constitution as offering protections co-extensive with those of the Takings Clause in the Fifth Amendment. *Phillips v. Montgomery Cty.*, *442 S.W.3d 233, 244 (Tenn. 2014).*

46. In response to the US Supreme Court ruling in, *Kelo v. City of New London, 545 U.S. 469 (2005)*, also see, *Governor Phil Bredesen signed Public Act 863* (the "Act"). The Act begins with a reaffirmation that Tennessee's Constitution, in conjunction with the Fifth Amendment of the Federal Constitution, protects the right of an individual to own property and to be free from capricious and arbitrary takings of that property by the government. *Id*. Essentially, the General Assembly turned takings jurisprudence on its head and effectively foreclosed the possibility of an outright *Kelo* condemnation in Tennessee. This taking is not just capricious and arbitrary it was a fraudulent taking for the Defendants' use while the taxpayers pay for it.

47. Government may indeed seize an interest in real property for the construction of roads, highways, bridges, public facilities, or other forms of public transportation. *Tenn. Code Ann. § 29-17-102(b)(1))*. However, the government may not invoke the power of

eminent domain unless it is unable to obtain the property or any comparable alternative property, after undertaking "good faith negotiations." *2006 Tenn. Pub. Acts 863 § 3 Ten 13-16-207(f) 2007 Tenn. Code Ann 6-58-101 to 107 (2005)* outlining comprehensive growth plans) Good faith – 2 Appraisals by independent qualified appraisers *13-16-207(f)(2).*

## THE CITY OF PIGEON FORGE VIOLATED THE PROCEDURAL MECHANISM FOR EMINENT DOMAIN

48. In January of 2024, the City of Pigeon Forge filed a Petition of Condemnation.

49. Tennessee Code Annotated provides that any government holding the power to condemn property and seeking to condemn property must provide the property owner with at least thirty days' notice before undergoing any additional steps. *T.C.A. § 13-20-201.* Further, the appraisal report must include the property's best and highest use, the current use of the property at the time of the proceeding, and a description of "any other use to which the property is legally adaptable at the time of the taking." *Id. and also see Record.* The City could not by contract and resolution and without ordinance authorize the state to eliminate grade crossing on streets subject to the jurisdiction of the city. *Wilkey v. Cincinnati, N. O. & T. P. R. Co., 47 Tenn. App. 556, 340 S.W.2d 256, 1960 Tenn. App. LEXIS 90.* To wit:

> Construct, improve, reconstruct, and reapprove by opening, extending, widening, grading, curbing, guttering, paving, graveling, macadamizing, draining, or otherwise improving any streets, highways, avenues, alleys, or other public places within the corporate limits, and access a portion of the cost of such improvements upon the property abutting upon or adjacent to such streets, highways or alleys as provided by title 7, chapters 32 and 33.

50. The eminent domain statutes are to be strictly construed, to the extent of the interest that may be acquired by a condemner, and the condemner can take no greater interest in land condemned than is necessary for the proposed use. In the absence of express

legislative authority, circuit courts in Tennessee are without jurisdiction to adjudge the fee in lands to a condemner, and unless the statute expressly authorizes the taking of the fee in lands, the appropriation is limited to a mere easement. *10 Tenn. Juris § 71 (2024).*

51. A municipal corporation is not entitled to acquire a fee in land by condemnation where it already has an easement that is sufficient for the purpose needed. *Madisonville v. Cagle, 159 Tenn. 600, 21 S.W.2d 385 (1929).*

52. The Plaintiffs always wanted to fight condemnation and have been unable to do so because of the conspiracy and the City's Attorney, Nathan Rowell.

53. Mr. Rowell consistently insisted on the Races to be silent. For instance, on February 8, 2024, David Wear emailed Mr. Rowell the following lie;

> "However, in your continued search for a villain for your next YouTube episode, you conveniently missed the Membership Purchase Agreement in which I sold my interest for $0 to the current owner. If you would have been truly curious, you would have observed that the agreement was dated before any votes were taken on the matter and took several months to prepare."

**Exhibit L**.

54. The Races never agreed to the condemnation so it was shocking when on June 26th, 2024, while the Races believed they were still fighting and were paying the mortgage the home was bulldozed. **Exhibit M**.

55. On July 11, 2024, in an attempt to harass and intimidate the Races, Earlene Teaster wrote a "Statement from Pigeon Forge City Manager Earlene Teaster", stating that they had offered the Races $539,000 and the Races had refused never mentioning the fact the property was able to sleep up to 10 people and could make approximately $175,000 a year. **Exhibit N**.

56. It is also important to note that even before the City fraudulently obtained the May 6, 2024 "Agreed Order" Appalachian was trenching the Race's driveway and today campsites set on part of the property.  **Collective Exhibit O**.

## COUNT I:  CONSPIRACY TO VIOLATE PLAINTIFFS' FIFTH AND FOURTEENTH AMENDMENT RIGHTS

### ALL DEFENDANTS

### (42 U.S.C. § 1985 AND § 1983)

57. Plaintiffs restate all previous paragraphs in support of Count I.

58. At all relevant times herein, the Defendants were acting under color of law.

59. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

60. Defendants are liable herein as they acted under the color of law in such a way that deprived the Plaintiffs of the rights, privileges, or immunities guaranteed to them by the Constitution or by federal or state law.

61. Defendants' actions alleged herein violate the Plaintiffs' due process rights guaranteed by U.S. Const. amend V and XIV as the Defendants deprived the Plaintiffs of their property rights without due process of law.

62. As a direct result of the Defendants' violation of the Plaintiffs' fundamental rights herein, the Plaintiffs have suffered millions of dollars in damages.

63. As a direct result of the Defendants' violation of the Plaintiffs' fundamental rights, the Plaintiffs have suffered extreme emotional distress and anguish as they spent

their life savings on the property in question and were going to use it for commercial use and personal use. The emotional distress caused by the Defendants' unlawful actions has caused the Plaintiffs sleepless nights, nausea, inability to eat, migraine headaches, and nightmares when they can fall asleep.

## Count II: VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS AGAINST THE CITY OF PIGEON FORGE AND DAVID WEAR
### (42 U.S.C. 1983)

64. Plaintiffs reinstate all previous paragraphs in support of Count II.

65. The First Amendment to the United States Constitution applied to state actors through the Fourteenth Amendment, guarantees the right to free speech.

66. Defendant, under color of law, retaliated against Plaintiff's protected speech by instituting and executing an unlawful condemnation proceeding and bulldozing her home.

67. Defendant's actions were motivated by Plaintiff's exercise of her right to speak on matters of public concern, namely the fact that the City of Pigeon Forge was masking a condemnation for public benefit when it is for private benefit.

68. As a direct and proximate result, Plaintiff suffered loss of property, emotional distress, and other damages.

## WHEREFORE, PREMISES CONSIDERED, THE PLAINTIFFS PRAY FOR JUDGMENT AS FOLLOWS:

A. Order Defendants to provide Plaintiffs with damages in the amount of $10,000,000.00 to include emotional damages, as well as punitive damages

B. For an award of the Plaintiffs' attorney's fees and expenses in this litigation.

C. For expedited discovery given the threat of adulteration of ESI and metadata which will be highly relevant to this case.

D.  For a jury to try this cause.

Respectfully submitted,

**THE EGLI LAW FIRM**

s/Russ Egli
Russ Egli, BPR#24408
The Egli Law Firm
11109 Lake Ridge Drive, Fl3
Knoxville, TN 37934
865-274-8872
theeglilawfirm@gmail.com

*Attorney for the Plaintiffs*

## ECF CERTIFICATE OF SERVICE

I, the undersigned authority, certify that a true and accurate copy of the foregoing First

Amended Complaint has been sent to:

Brian Bibb, Esq.
bbibb@watsonroach.com

s/Russ Egli
Russ Egli, BPR#24408
The Egli Law Firm

# EXHIBIT A



VICINITY MAP

THIS IS TO CERTIFY THAT I HAVE CONSULTED
THE FEDERAL INSURANCE ADMINISTRATION
FLOOD HAZARD BOUNDARY MAP AND FOUND
THAT THE BELOW DESCRIBED PROPERTY IS NOT
LOCATED IN A SPECIAL FLOOD HAZARD ZONE.

PARK SUBDIVISION
MAP BOOK 8 PAGE 77

WHALEY
W.D.B. 254 P. 383

OGLE
W.D.B. 128 P. 581

RUTHVEN
W.D.B. 230 P. 170

WEAR
W.D.B. 128 P. 569

0.360 AC.
15,694.34 SQ. FT.

20 FT. PRIVATE DRIVE

WEAR
W.D.B. 101 P. 550

OGLE
W.D.B. 128 P. 57

WEAR
W.D.B. 128 P. 569

OGLE
W.D.B. 119 P. 298

OGLE    DRIVE

NOTES:
(1) ZONED R-1
(2) MINIMUM YARD REQUIREMENTS FROM PROPERTY LINES.
      30 FT. FRONT
      25 FT. REAR
      15 FT. EACH SIDE LINE
(3) ——S——S—— 6" SANITARY SEWER LINE
(4) ——W——W—— 6" FIRE WATER LINE

State of Tennessee, County of SEVIER
Received for record the 05 day of
APRIL 1994 at 1:30 PM. RECON  84893
Recorded in official records
Book 728    Page  65 - 66 DIV $   2.00
Notebook   51  Page  136
State Tax $      .00 Clerks Fee $  .00-
Recording $ 10.00- Total $    12.00-
Register of Deeds SHERRY ROBERTSON
Deputy Register ANNETTE

SURVEY FOR

# LORENE M. WEAR
### AND HUSBAND
# FRANK W. WEAR JR.

350 OGLE DRIVE
PIGEON FORGE, TENN. 37863

JACK C. TARWATER
REGISTERED LAND SURVEYOR
TENNESSEE No. 976

I HEREBY CERTIFY THAT THIS IS A CATEGORY
I  SURVEY AND THE RATIO OF
PRECISION OF THE UNADJUSTED SURVEY
IS 1:10,000    AS SHOWN HEREON.

JACK C. TARWATER  R.L.S. 976
COUNTY SURVEYOR
400 HICKS DRIVE
SEVIERVILLE, TENN.
37862  453 3326

~ SITE PLAN ~
DAVID OGLE FARM
MAP BOOK 4 PAGE 109
CITY OF PIGEON FORGE
BEING A PORTION OF THE WEAR PROPERTY
AS DESCRIBED IN W.D.B. 101 P. 550 AND
W.D.B. 128 P. 569
DISTRICT 5  SEVIER CO. TENN.
SCALE 1" = 50    14 OCT. 1993

TAX MAP 94 - F PARCEL 31

50'   0'   50'   100'   150'

FBI26P25 ( C-G DISK 4 )

# EXHIBIT B

PREPARED BY:
JOHNSON, MURRELL & ASSOCIATES, P.C.
150 COURT AVENUE
SEVIERVILLE, TN 37862

Sevier County Register's Office
Re: Book 2581, Page 431
Book 2579, Page 226
Book 2868, Page 672
Book 3026, Page 362
Book 3079, Page 202
Book 3093, Page 171

## CROSS DEFAULT AND
## CROSS COLLATERALIZATION AGREEMENT

**THIS CROSS DEFAULT AND CROSS COLLATERALIZATION AGREEMENT** (this **"Agreement"**) dated as of the 9th day of September, 2009, is entered into by **WEAR DEVELOPMENT GROUP, LLC, a Tennessee Limited Liability Company, JOHN WEAR, JESSICA JOEL WEAR, DAVID WEAR AND KEESHA WEAR** (collectively referred to hereinafter as the **"Borrowers and Grantors"**), **JOHN PAUL WEAR and DAVID WESLEY WEAR, and WEAR DEVELOPMENT GROUP, LLC** (the **"Guarantors"**) and **MOUNTAIN NATIONAL BANK**, its successors and/or assigns (the **"Lender"**).

### W I T N E S S E T H:

**WHEREAS,** Lender made six (6) loans to Borrowers, said loans being more particularly described and secured as set forth on Exhibit "A" attached hereto and incorporated herein by this reference; and

**WHEREAS,** Lender has agreed to make certain modifications to the loan if and only if Borrowers enter into this agreement for the purpose of cross collateralizing the six (6) loans listed on Exhibit "A", so that default under one shall be default under all loans made by Lender to Borrowers (or to any one or more of them) and;

**WHEREAS,** it is the intention of Borrowers, Grantors and Lender that all collateral in which Lender now has (as the same is shown on Exhibit "B" attached hereto and incorporated herein by this reference), or may hereafter obtain a lien on or security interest in, shall secure payment and performance of all loans, advances and other extensions of credit heretofore, now, or hereafter made by Lender to Borrowers (or to any one or more of them).

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is acknowledged, including the inducement of Lender, in its sole discretion, to extend credit or other financing accommodations to Borrowers (or any one or more of them).

(1)    **DEFINITIONS:** As used in this Agreement, the terms listed below shall have the following meaning:

        **A.  "Obligation"** shall mean any liability, indebtedness or obligation of Borrowers (or any one or more of them) to Lender of every kind and nature, now existing or hereafter arising, whether created directly or acquired by assignment, whether matured or unmatured, and any cost or expense including reasonable attorneys' fees incurred in the

collection or enforcement of any such obligation, and including, but not limited to the obligation shown on the attached Exhibit "A";

        **B. "Security Agreement"** shall mean any existing or future agreement between Borrower (or any one or more of them) and Lender which creates or provides for a security interest in or lien upon any of the assets or property (tangible or intangible, real or personal) of Borrower listed on Exhibit "B", including but not limited to the security agreements, deeds of trust, modifications of deeds of trust, lease agreements, assignments of rents and leases, UCCs, promissory notes and modifications of promissory notes, as the same are set forth on Exhibit "A".

      (2)    **CROSS-COLLATERALIZATION:** All collateral listed on Exhibit "B", now or hereafter subject to a security interest or lien of Lender pursuant to any or all of the Security Agreements, shall secure any and all Obligations, and the proceeds of any collateral, and may be applied to any of the Obligations as Lender may see fit subject to applicable law.

      (3)    **CROSS DEFAULT:** In addition to and not in substitution for any provisions in any of the Security Agreements evidencing Obligations, it is agreed that any default or breach by Borrower (or any one or more of them) in the payment or default of a material nature under any Security Agreement or promissory note executed by Borrower (or any one or more of them) in favor of Lender, shall, at the option of the Lender, constitute a default under each Security Agreement of the Borrower and all promissory notes and guaranty agreements arising therefrom.

      (4)    **RELEASE OF SPECIFIC BORROWER:** It is the intent of the Lender by separate modification agreement to release **Wendell Spence** as Borrower under a note dated July 25, 2006 in the original amount of $35,000.00. It is further the intent of the Lender and the remaining Borrowers to assume all indebtedness of said Wendell Spence.

     It is also the intent of the Lender to release the 1/3 undivided interest of **David Dixon** in and to the property more particularly described in Trust Deed of record in Book **2868, Page 672,** in the Register's Office for Sevier County, Tennessee. This release shall be done by a separate partial release to be recorded simultaneous with this document.

      (5)    **GUARANTORS:** Guarantors join in executing this document to acknowledge, confirm and continue their existing obligations as Guarantors and to extend said guaranty agreements as collateral for all loans described upon the attached Exhibit "A".

      (6)    **EFFECT ON OTHER AGREEMENTS:** This Agreement shall constitute an amendment to and supplement of each of the Security Agreements now or hereafter executed by Borrowers (or by any one or more of them) in favor of Lender, and this Agreement shall augment and be in addition to and not in substitution for any provision of any Security Agreement or Obligation and shall not otherwise limit or affect the rights and remedies of the Lender under any such Security Agreement or Obligation.

(7) **FUTURE LOANS:** Lender may, in its sole and absolute discretion, make additional loans and other financing accommodations to Borrower (or any one or more of them) all of which will be subject to the terms of this Agreement. Notwithstanding anything to the contrary, any future change in the terms of Borrower's indebtedness shall require the written consent of the Lender.

(8) **WAIVER OF TRIAL BY JURY:** Borrowers waive trial by jury in any action or proceeding brought by the Lender in any counterclaim asserted by the Lender against the Borrowers (or any one of them) or in any manner connected with this Agreement or any Security Agreement or Obligation.

(9) **NOTICES:** Any notice provided for in or concerning this Agreement shall be in writing and deemed sufficient given two (2) days after the deposit in the U.S. Mails with sufficient postage if given registered or certified mail, or the date of actual personal delivery to the following addresses:

              **LENDER:**          **Mountain National Bank**
                                    **Attn: Chad Reagan**
                                    **300 East Main Street**
                                    **Sevierville, TN 37862**

              **BORROWER:**      **John Wear and David Wear**
                                    **PO Box 453**
                                    **Pigeon Forge, TN 37868**

                                    **Wear Development Group, LLC**
                                    **PO Box 453**
                                    **Pigeon Forge, TN 37868**

The person and place to which notice may be given may be changed from time to time by either party upon thirty (30) days prior written notice.

(10) **NO OTHER UNDERSTANDINGS:** Borrowers acknowledge that the Lender had made no promises to induce execution of this Agreement and that there are no other agreements or understandings, either oral or in writing, affecting this Agreement and nothing in this Agreement shall be considered a waiver by the Lender of any existing or future defaults by Borrowers (or any one of them) of any Security Agreement or Obligation. No further modification or amendment of this Agreement shall be made except in writing executed by the parties to this Agreement.

(11) **GOVERNING LAW:** This Agreement and the performance hereunder shall be construed and determined in accordance with the laws of the State of Tennessee.

(12) **SUCCESSORS AND ASSIGNS:** The provisions of this Agreement shall be binding upon and shall inure to the benefit of the heirs, administrators, successors, and assigns of the Borrowers and the Lender.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

WEAR DEVELOPMENT GROUP, LLC

BY: _____

ITS: MANAGING MEMBER

_____
JOHN WEAR

_____
KEESHA WEAR

_____
DAVID WEAR

_____
JESSICA JOEL WEAR

MOUNTAIN NATIONAL BANK

BY: _____
CHAD REAGAN
ITS: VICE PRESIDENT

STATE OF TENNESSEE
COUNTY OF SEVIER

Personally appeared before me, the undersigned, a Notary Public, **JOHN PAUL WEAR,** with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged that he executed the within instrument for the purposes therein contained, and who further acknowledged that he is the **MANAGING MEMBER** of the maker, **WEAR DEVELOPMENT GROUP, LLC,** or a constituent of the maker and is authorized by the maker or by its constituent, the constituent being authorized by the maker, to execute the instrument on behalf of the maker.

WITNESS my hand, at office, this 9th day of September, 2009.

_____
NOTARY PUBLIC
My Commission expires: 2-23-2010

STATE OF TENNESSEE
COUNTY OF SEVIER

Personally appeared before me, the undersigned, a Notary Public, **JOHN WEAR, DAVID WEAR, JESSICA JOEL WEAR, AND KEESHA WEAR,** with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged that they executed the within instrument for the purposes therein contained.

WITNESS my hand, at office, this 9th day of September, 2009.

_____
NOTARY PUBLIC
My Commission expires: 2-23-2010

STATE OF TENNESSEE
COUNTY OF SEVIER

Personally appeared before me, the undersigned, a Notary Public, **CHAD REAGAN** with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who acknowledged that he executed the within instrument for the purposes therein contained, and who further acknowledged that he is the **VICE PRESIDENT** of the maker, **MOUNTAIN NATIONAL BANK**, or a constituent of the maker and is authorized by the maker or by its constituent, the constituent being authorized by the maker, to execute the instrument on behalf of the maker.

WITNESS my hand, at office, this 9th day of September_, 2009.



NOTARY PUBLIC
My Commission expires: 2-23-2010



**BK/PG: 3420/58-68**

**09048757**

| | |
|---|---|
| 11 PGS : AGREEMENT | |
| CHRISTY BATCH: 158204 | |
| 09/18/2009 - 02:04 PM | |
| VALUE | 0.00 |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 0.00 |
| RECORDING FEE | 80.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 0.00 |
| TOTAL AMOUNT | 82.00 |

STATE OF TENNESSEE, SEVIER COUNTY
**SHERRY ROBERTSON HUSKEY**
REGISTER OF DEEDS

## EXHIBIT A

(1) **Loan #401251700: A loan to Borrower Wendell Spence, John Wear and David Wear,** evidenced by a promissory note dated July 25, 2006, **in the principal amount of $35,000.00,** the repayment of which is secured by a Deed of Trust of even date, of record in Book 2581, Page 431, in the Register's Office for Sevier County, Tennessee; wherein Unit 108 of Fountain Park Office Condominium and Lot 16 and a portion of Lot 17 of Ogle Addition were taken as collateral.

(2) **Loan #401449600: A loan to Borrower Wear Development Group, LLC,** evidenced by a promissory note dated February 28, 2007, **in the principal amount of $60,000.00,** the repayment of which is secured by a Credit Line Deed of Trust of even date, of record in Book 2759, Page 226, in the Register's Office for Sevier County, Tennessee; wherein Unit 108 of Fountain Park Office Condominium and Lot 16 and a portion of Lot 17 of Ogle Addition were taken as collateral.

(3) **Loan #401559900: A loan to Borrower John P. Wear and David W. Wear,** evidenced by a promissory note dated July 10, 2007, **in the principal amount of $245,000.00,** the repayment of which is secured by a Deed of Trust of even date, of record in Book 2868, Page 672, in the Register's Office for Sevier County, Tennessee; wherein property more particularly described in the Affidavit of record in Book 3357, Page 211 in the Register's Office for Sevier County, Tennessee, was taken as collateral. See also Scrivener's Affidavit of record in Book 2868, Page 668 in the Register's Office for Sevier County, Tennessee.

(4) **Loan #401738400: A loan to Borrower Wear Development Group, LLC,** evidenced by a promissory note dated February 21, 2008, **in the principal amount of $225,000.00,** the repayment of which is secured by a Construction Deed of Trust of even date, of record in Book 3026, Page 362, in the Register's Office for Sevier County, Tennessee; wherein Lot 3 of the resubdivision of the Roy Von Campbell Property was taken as collateral.

(5) **Loan #401787200: A loan to Borrower Wear Development Group, LLC,** evidenced by a promissory note dated April 25, 2008, **in the principal sum of $155,000.00,** the repayment of which is secured by a Construction Deed of Trust of even date, of record in Book 3079, Page 202, in the Register's Office for Sevier County, Tennessee; wherein Lot 45 of Burning Oaks, Phase II was taken as collateral.

(6) **Loan #401797500: A loan to Borrower Wear Development Group, LLC,** evidenced by a promissory note dated May 19, 2008, **in the principal amount of $550,000.00,** the repayment of which is secured by a Credit Line Deed of Trust of even date, of record in Book 3093, Page 171, in the Register's Office for Sevier County, Tennessee; wherein Lot 6 of Autumn Ridge Estates Subdivision and Lot 141 of the Majestic Meadows, Phase III were taken as collateral. This loan is further secured by the following items of personal property:

> One (1) used 2004 JOHN DEERE MODEL 135C RTS HYDRAULIC EXCAVATOR PRODUCT NUMBER FF135CX300124. All debtor's equipment, whether now owned or hereafter acquired, including any and all accessories, attachments, parts and replacements thereto.

> One (1) used 1992 FORD L8000 Dump Truck VIN # 1FDZU82A6NVA16113 and all parts, attachments, accessories, repairs, improvements, and accessions now or hereafter affixed thereto.

> One (1) used 1993 FORD L9000 Aeromax Dump Truck VIN # 1FDZU90T0PVA36337 and all parts, attachments, accessories, repairs, improvements, and accessions now or hereafter affixed thereto.

> One (1) new 1999 GMC 3500 Savana Van VIN # 1GTHG35R9X1065912 and all parts, attachments, accessories, repairs, improvements, and accessions now or hereafter affixed thereto.

PARCEL 2A

4100 9/e

**THE 1/3 UNDIVIDED INTEREST OF JOHN P. WEAR AND THE 1/3 UNDIVIDED INTEREST OF DAVID W. BEAR IN AND TO PROPERTY:**

SITUATE in the 5th Civil District of Sevier County, Tennessee and being all of Grantors interest in and to a **2.0885 acre tract** as shown on survey for Richard Orville Green, III of record in Map Book 34, Page 251 in the Register's Office for Sevier County, Tennessee to which reference is here made for exact legal description.

BEING the same property conveyed to John P. Wear, married, a 1/3 undivided interest; David W. Wear, married, a 1/3 undivided interest; and David Dixon, married, a 1/3 undivided interest from Richard Orville Greene, III, and wife, Johnna Beth Greene; and Leona S. Ogle, widow by Deed dated July 11, 2007, of record in Deed Book 2868, Page 668, in the Register's Office for Sevier County, Tennessee.

PARCEL 2B

**THE 1/3 UNDIVIDED INTEREST OF JOHN P. WEAR AND THE 1/3 UNDIVIDED INTEREST OF DAVID W. BEAR IN AND TO PROPERTY:**

SITUATE, LYING AND BEING in the Fifth (5th) Civil District of Sevier County, Tennessee, and being a **PART OF THE DAVID OGLE FARM** as the same appears on a plat of record in Map Book 4, Page 109, in the Register's Office for Sevier County, Tennessee, and being more particularly described as follows:

BEGINNING at an old road on the Western right-of-way line of a street known as Trevena Road, being a short distance South from the intersection of Trevena Road with a street known as Ogle Drive, being further a common corner of Wayne Ogle (W.D. Book 128, Page 571), with Carl Ogle (W.D. Book 128, Page 565), and being Northeastern end of a 30 foot right-of-way described more fully below, then leaving Trevena Road and running along the Northern edge of said 30 foot right-of-way described more fully below, then leaving Trevena Road and running along the Northern edge of said 30 foot right-of-way with a bearing of south 81 deg 21 min. 17 sec. East for a distance of 200.00 feet to an old rod and continuing to run along the Northern edge of said right-of-way with a bearing of South 58 deg. 14 min. 09 sec. East to an old rod at a stump on the edge of the bank on the Southern side of Mill Creek, being also the Eastern boundary line of the subject property herein conveyed; **THENCE FROM THIS POINT OF BEGINNING,** South 35 deg. 09 min. 00 sec. West leaving said creek bank and running along the common boundary line between subject property and the remainder of the Carl Ogle property for a distance of 176.54 feet to an old rod at the Southeastern corner of subject property and being a common point with Carl Ogle; thence North 33 deg. 18 min. 47 sec. West running along the Southern boundary line of subject property, being also a common boundary line with Carl Ogle, for a distance of 170.87 feet to an old rod at an oak; thence North 54 deg. 38 mi 11 sec. West containing along the Southern boundary line of subject property, being also a common boundary line with Carl Ogle, for a distance of 155.72 feet to an old rod at the Southwestern corner of subject property, being also a common point with Carl Ogle, and being a point on the Southern edge of the creek bank of Mill Creek; thence North 15 deg. 06 min. 11 sec. East running along the Western boundary line of subject property, said Western boundary line extending a distance of 225.00 feet Western boundary line extending a distance of 25.00 feet out into the approximate center of Mill Creek to a point; thence North 83 deg. 00 min. 41 sec. East leaving the remainder of the property of Carl Ogle and running along in Mill Creek for a distance of 91.97 feet to a point, said point being North 20 deg. 03 min. 06 sec. East a distance of 14.02 feet from an old rod at a Sycamore on the Southern bank of Mill Creek; thence South 73 deg. 21 min. 46 sec. East continuing to run along in

Book 2878, Page 240, in the Register's Office for Sevier County, Tennessee as shown on the Quit Claim Deed of record in Deed Book 3334, Page 89, in said Register's Office. Known as Tax Map 94, Parcel 151.05.

**SAVE AND EXCEPTED** from the above described property is the property conveyed to Richard Orville Greene, III, single, from Carl H. Ogle and wife, Leona S. Ogle by Deed dated April 5, 1988, recorded May 20, 1988, in Warranty Deed Book 398, Page 781, in the Register's Office for Sevier County, Tennessee.

**SAVE AND EXCEPTED** from the above described property is the property conveyed to Mark Todd Greene and wife, Veronica Greene from Carl H. Ogle and wife, Leona S. Ogle by Deed dated April 5, 1988, recorded November 10, 1988, of record in Warranty Deed Book 409, Page 143, in the Register's Office for Sevier County, Tennessee.

**SAVE AND EXCEPTED** from the above described property is the property conveyed to Richard Orville Greene, III, single, from Carl H. Ogle and wife, Leona S. Ogle by Deed dated October 25, 1991, recorded October 28, 1991, of record in Warranty Deed Book 464, Page 732, in the Register's Office for Sevier County, Tennessee.

**SAVE AND EXCEPTED** from the above described property is the property conveyed to Richard Orville Greene, III, and wife, Carey Lynn Greene from Carl H. Ogle and wife, Leona S. Ogle by Deed dated February 3, 1992, recorded February 5, 1992, of record in Warranty Deed Book 469, Page 743, in the Register's Office for Sevier County, Tennessee.

**SAVE AND EXCEPTED** from the above described property is the property conveyed to Garland Harmon, Marvin Harmon, Thomas C. Cowart and Thomas C. Cowart, Jr. from Carl H. Ogle, and wife, Leona S. Ogle by Deed dated December 22, 1993, recorded December 22, 1993, of record in Deed Book 512, Page 104, in the Register's Office for Sevier County, Tennessee.

**SAVE AND EXCEPTED** from the above described property is the property conveyed to F. Shane Patterson, by Quit Claim Deed Carl H. Ogle is deceased having died on or about July 22, 1996, leaving Leona S. Ogle as the surviving tenant by the entirety.

**John P. Wear and David W. Wear** are conveying their 1/3 undivided interest in the above described property only. The 1/3 undivided interest of David Dixon is not being pledged as collateral for this Cross Collateralization and Cross Default Agreement.

## PARCEL 3

**SITUATE** in the Fifth (5th) Civil District of Sevier County, Tennessee and being **Lot 3 of the resubdivision of the ROY VON CAMPBELL PROPERTY** as the same appears on a plat of record in Map Book 36, Page 68 in the Register's Office for Sevier County, Tennessee, to which reference is here made for a more particular description.

**SUBJECT** to restrictions, reservations and easements of record in Book 2284, Page 310, Large Map Book 4, Page 134 and Map Book 36, Page 68, all in the Register's Office for Sevier County, Tennessee.

**SUBJECT** to any and all applicable restrictions, easements and building setback lines as are shown in the records of the said Register's Office.

**BEING** the same property conveyed to John P. Wear, married, by deed from R & D Associates, a general partnership comprises of Don E. Gibson and Randy Miles, dated January 7, 2008 of record in Book 2989, Page 632 in the Register's Office for Sevier County, Tennessee.

Mill Creek for a distance of 150.29 feet to a point, said point being north 21 deg. 00 min. 25 sec. East a distance of 112.68 feet to a point, said point being North 35 deg. 09 min. 00 sec. East a distance of 13.74 feet from an old rod on the Southern bank of Mill Creek thence South 35 deg. 09 min. 00 sec. West leaving the point in Mill Creek and running through the water along the Western boundary line of subject property for a distance of 13.74 feet to an old rod at a stump on the Southern bank of Mill Creek and being along on the western boundary line of subject property, and being the **BEGINNING** point as shown on the survey of Ronnie L. Sims, Registered Land Surveyor No. 683, dated January 22, 1992, at 1020 Topside Road, Sevierville, Tennessee 37862, entitled "Survey for Richard Orville Greene, III."

**TOGETHER** with a 30 foot right-of-way for ingress and egress into the above described property, said right-of-way running from the Western right-of-way line of the street known as Trevena Road and entering the Western boundary line of the above described property, and being more specifically described on the above referenced survey.

**BEING** the same property conveyed to John P. Wear, married, a 1/3 undivided interest; David W. Wear, married, a 1/3 undivided interest; and David Dixon, married, a 1/3 undivided interest from Richard Orville Greene, III, and wife, Johnna Beth Greene; and Leona S. Ogle, widow by Deed dated July 11, 2007, of record in Deed Book 2868, Page 668, in the Register's Office for Sevier County, Tennessee.

### PARCEL 2C

**THE 1/3 UNDIVIDED INTEREST OF JOHN P. WEAR AND THE 1/3 UNDIVIDED INTEREST OF DAVID W. BEAR IN AND TO PROPERTY:**

**SITUATE** in District Five (5) of Sevier County, Tennessee, and being **part of the David Ogle Farm** as shown by plat dated 2/16/54, of record in Map Book 4, Page 109, Register's Office, Sevier County, Tennessee, to which reference is here made, and more particularly described as follows:

**BEGINNING** on an iron pin shown as the Beginning corner on said plat; thence S 68 E 215.5 feet to a stake at the northern edge of Mill Creek; thence S 48 E 528 feet to a Ford, corner to Robertson; thence S 49 W 272 feet; thence S 11 W to a Pine; thence S 82 W 181 feet to a Beech; continuing S 82 W 112 feet to an Oak; thence continuing S 82 W 237 feet to a Poplar at the eastern side of a farm road; thence crossing said farm in a westerly direction 30 feet more or less to a stake; thence in a westerly direction and with the fence 400 feet more or less; thence in a southwesterly direction and with the fence 1085 feet more or less to a stake in the old line; thence due N 787 feet to a stake corner to Lorene Wear; thence N 27 E 990 feet to a stake corner to Wayne Ogle; thence S 61 E 108 feet to a stake; thence N 87' 36' F 138 feet to a point in Mill Creek near a Walnut; thence S 62° 24' E 250 feet to a point in the center of Mill Creek; thence S 80° 42' E 197 feet to a point in the center of Mill Creek; N 72° 54' E 96.7 feet to the Beginning corner. Containing 26.3 acres more or less.

**The above** described property is conveyed subject to the life estate of Mrs. Mollie Ogle, who shall retain the possession, use and income of said land as long as she lives.

**BEING** part of the same property conveyed to John P. Wear, married, a 1/3 undivided interest; David W. Wear, married, a 1/3 undivided interest; and David Dixon, married, a 1/3 undivided interest from E. Shane Patterson by Quit Claim Deed of record in Deed Book 3334, Page 89, in the Register's Office for Sevier County, Tennessee.

**SAVE AND EXCEPTED** from the above described property is a **.48 acre tract** more or less as outlined in the Survey of Jonathan L. Lyons, 360 Surveying & Mapping, P.O. Box 554, Seymour, Tennessee 37865, and being PART OF the same property conveyed to E. Shane Patterson, single from Leona S. Ogle, widow, by Quit Claim Deed dated July 10, 2007, of record in Deed

## PARCEL 4

SITUATE in the Third (3rd) Civil District of Sevier County, Tennessee and being all of **Lot 45 of BURNING OAKS, PHASE 2**, as the same is shown on plat of record in Large Map Book 7, Page 165 in the Register's Office for Sevier County, Tennessee, to which reference is here made for a more particular description.

SUBJECT to restrictions, easements and building setbacks of record in Book 1844, Page 42, and re-recorded in Book 1850, Page 81 and amended in Book 2945, Page 648, all in the Register's Office for Sevier County, Tennessee.

BEING the same property conveyed to Wear Development Group, LLC, a Tennessee Limited Liability Company by Deed from John Wear, dated April 25, 2005, and recorded in Book 3079, Page 200 in the Register's Office for Sevier County, Tennessee.

## PARCEL 5

**PARCEL 5A**
SITUATE in the First (1st) Civil District of Sevier County, Tennessee and being all of **Lot 6 of AUTUMN RIDGE ESTATES SUBDIVISION** as the same appears on a plat of record in Map Book 34, Page 147 in the Register's Office for Sevier County, Tennessee, to which reference is here made for a more particular description.

SUBJECT to restrictions, reservations and easements as shown in Book 1744, Page 136 and as amended in Book 1984, Page 285, Book 2541, Page 437 and Book 2717, Page 679, and Map Book 34, Page 147, all in the Register's Office for Sevier County, Tennessee.

ALSO SUBJECT TO any and all restrictions, easements and building setback lines as are shown in the Register's Office for Sevier County, Tennessee.

BEING the same property conveyed to John P. Wear and Jessica Joel Lewis by deed from Eric R. Kelch and wife, Leslie J. Kelch dated October 22, 2003 and recorded in Book 1825, Page 585 in the Register's Office for Sevier County, Tennessee.

Jessica Joel Lewis, Jessica Joel Lewis Wear, Jessica Wear and Jessica J. Wear are one and the same person.

John Wear, John P. Wear and John Paul Wear are one and the same person.

David Wear and David W. Wear are one and the same person.

**PARCEL 5B**
SITUATE in the Ninth (9th) Civil District of Sevier County, Tennessee, and being **Lot 141 of MAJESTIC MEADOWS, PHASE III**, as the same is shown by plat of record in Large Map Book 6, Page 181 in the Register's Office for Sevier County, Tennessee for a more particular description.

SUBJECT to restrictions, reservations and easements as sec forth in Book 2033, Page 811 and amended in Book 2433, Page 328 and Large Map Book 6, Page 181 in the said Register's Office.

BEING the same property conveyed to Wear Development Corp, LLC by Deed from Majestic Meadows, a Tennessee General Partnership of record in Book 2433, Page 460 in the Register's Office for Sevier County, Tennessee.

J:\DATA\WP8\TRUST\CrossCollateral\Wear Development Cross Collateralization.doc

**EXHIBIT B**

**[ALL COLLATERAL BEING TAKEN BY LENDER TO BE HELD IN TRUST, PURSUANT TO THE TERMS OF THIS AGREEMENT]**

## PARCEL 1

**PARCEL 1A**
SITUATE in the Fifth (5th) Civil District of Sevier County, Tennessee and being all of **Unit 108 of FOUNTAIN PARK OFFICE CONDOMINIUMS** as described in Master Deed of record in WD Book 646, Page 445 in the Register's Office for Sevier County, Tennessee, to which reference is here made for a more particular description.

TOGETHER with and subject to an undivided interest in the common elements, vote, common surplus, liability for the common expenses and other assessments appurtenant thereto and as set forth and delineated in the hereinabove referenced Master Deed of Fountain Park Office Condominiums, a Horizontal Property Regime.

SUBJECT to restrictions, reservations and easements as set forth in WD Book 646, Page 445 in the Register's Office for Sevier County, Tennessee.

BEING the same property conveyed to Wendell Spence, John Wear and David Wear by Deed of Michael H. Jenkins and wife, Cynthia J. Jenkins, dated July 21, 2006, and recorded in Book 2581, Page 429 in the Register's Office for Sevier County, Tennessee.

Wendell Spence joins in this Cross Collateralization Cross Default Agreement as an owner of the above described property, but no longer as a Borrower under the Promissory Note dated July 25, 2006.

**PARCEL 1B**
SITUATE in the Fifth (5th) Civil District of Sevier County, Tennessee and within the corporate limits of the City of Pigeon Forge and being **Lot 16 and the Southern one-half of Lot 17 of OGLE ADDITION**, and being more particularly described as follows:

BEGINNING at an iron pin in the Westerly edge of the right-of-way of Rena Street (formerly Grandeur Drive), this point being the Southeasterly corner of Lot 16; thence continuing along the Westerly edge of the right-of-way of Rena Street, North 31 deg. 13 min. West (passing through an iron pin at 100 feet, the Northeasterly corner of Lot 16), a total of 150.00 feet to an iron pin; thence leaving Rena Street, South 58 deg. 30 min. West 147.50 feet, more or less, to an iron pin; thence South 31 deg. 30 min. East (passing through an iron pin at 50.00 feet, the Northwesterly corner of Lot 16), a total of 150.00 feet to an iron pin, the Southwesterly corner of Lot 16; thence North 58 deg. 30 min. East 146.50 feet to the point of **BEGINNING**.

SUBJECT to restrictions, reservations and easements as set forth in WD Book 206, Page 380 in the Register's Office for Sevier County, Tennessee.

ALSO SUBJECT to any and all restrictions, easements and building setback lines as are shown in the Register's Office for Sevier County, Tennessee.

BEING the same property conveyed to John Wear by Quit Claim Deed of Jerry Wear and wife, Linda Wear dated July 17, 2006 and of record in Book 2577, Page 750 in the Register's Office for Sevier County, Tennessee.

# EXHIBIT C



Status:  Permit Issued

**Business**
Tekair Engineering Professionals

**Applicant**
Sunday Greg

**Physical Address**
306 OGLE DR
37853 PIGEON FORGE, TN

**Mailing Address**

**Lot Number**

**Subdivision**
WHISPERING PINES CONDOS

**Square Footage**
0

**Description**
Vendor will be adding a no replacing antennas and RRU's no changes  to the zones height or ground space of electrical

+ Add to my account

🗒 Request Inspect

**19-03-530**
Byers Cabin - 402 Ogle Dr - Foundation # 6450 (PROJECT ABANDONED - SEE 19-12-951 FOR COMPLETION)
Jurisdiction:  Pigeon Forge

**Type:**  Mechanical Devices Mechanical (Plan) Plumbing Devices Plumbing (Plan) Residential Building New

**Create Date:**  2019-03-19113:31:04.52

**Status:**  Withdrawn

**Business**

**Applicant**
BOND RYERS

**Physical Address**
402 OGLE DR
37854 PIGEON FORGE, TN

**Mailing Address**

**Lot Number**
PCNA

**Subdivision**
SURVEY RECORDED

**Square Footage**
3650

**Description**
Building a 5 bedroom cabin - see foundation permit 6250 and plan review fee on this account

+ Add to my account

🗒 Request Inspection

**19-05-905-PL**
Smith residence - Sewer connect - 538 Ogle Dr
Jurisdiction:  Pigeon Forge

**Type:**  Plumbing Devices Plumbing Permit

**Create Date:**  2019-05-15T07:47:37.72

**Status:**  Permit Issued

**Business**
Bob's Plumbing

**Applicant**

Office

# EXHIBIT D

This Instrument Prepared by:
R. Scott Pearson, Attorney
The Pearson Law Firm, PLLC
8904 Sony Lane
Knoxville, Tennessee 37923
Paramount File No. 191026

Maximum Principal Indebtedness
For Tennessee Recording Purposes
Is **$1,605,000.00** (new money)

**BK/PG: 5852/68-75**
**21028152**

| 8 PGS : TRUST MODIFICATION | |
|---|---|
| BATCH: 563287 | |
| **08/03/2021 - 08:00 AM** | |
| VALUE | 1605000.00 |
| MORTGAGE TAX | 1845.75 |
| TRANSFER TAX | 0.00 |
| RECORDING FEE | 40.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 1.00 |
| TOTAL AMOUNT | 1888.75 |

STATE OF TENNESSEE, SEVIER COUNTY
**CYNDI B PICKEL**
REGISTER OF DEEDS

# MODIFICATION OF DEED OF TRUST
# AND ASSIGNMENT OF LEASES AND RENTS

THIS MODIFICATION OF DEED OF TRUST made and entered into this the 6th day of July_____, 2021, by and between **APPALACHIAN SPRINGS, LLC,** a **Tennessee Limited Liability Company**, (hereinafter designated as "Borrower", which expression shall include Borrower's successors and assigns), and **MOUNTAIN COMMERCE BANK**, (hereinafter designated "Lender", which expression shall include its successors and assigns);

## WITNESSETH:

WHEREAS, Borrower originally executed and delivered to Lender a certain Promissory Note (the "Promissory Note") dated November 20, 2019, in the original principal amount of three-million, nine-hundred and fifty-thousand and no/100 ($3,950,000.00), payable to the Lender; and

WHEREAS, payment of the Promissory Note is secured by a Deed of Trust (the "Deed of Trust"), dated November 20, 2019, executed by Borrower, appearing of record in Book 5436, Page 199, along with Assignment of Leases and Rents (the "Assignment of Rents"), dated November 20, 2019, executed by Borrower, appearing in Book 5436, Page 211, in the Register's Office for Sevier County, Tennessee, and with said real property being secured described on Exhibit "A" attached hereto and incorporated by reference; and

WHEREAS, the Borrower and Lender now desire to modify the terms and conditions of the Promissory Note, Deed for Trust, and Assignment of Rents, and to evidence these modifications in writing, as required; and

WHEREAS, the Borrower and Lender now desire to modify the Promissory Note, Deed of Trust, and Assignment of Rents for the purpose extending new money, as more fully described in the Promissory Note.

NOW, THEREFORE, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree that the Deed of Trust and Assignment of Rents appearing of record in the Sevier County Register's Office, and Promissory Note, be, and the same are hereby modified, altered and amended as follows, to wit:

(1) **Said Promissory Note, Deed of Trust, and Assignment of Rents shall be amended by extending additional new money in the amount of one-million, six-hundred and five thousand and no/100 dollars ($1,605,000.00) and the new loan amount shall be five-million, five-hundred and fifty-five thousand and no/100 dollars ($5,555,000.00), in accordance with the terms and conditions of said Promissory Note. Further for the purposes of this Instrument, Borrower and Lender are executing this modification to perfect the legal description attached to said Deed of Trust and Assignment of Leases and Rents to replace the City of "Oak Ridge" with the City of "Pigeon Forge".**

BORROWER hereby expressly authorizes and directs Lender to take any and all appropriate and necessary action to conform the said Promissory Note, Deed of Trust, and Assignment of Rents, and any other security instruments in connection with said Loan, and any and all collateral documents of every and description whatsoever to reflect the terms and conditions as herein further modified, altered and changed, and by these presents, accepts, acknowledges, affirms and confirms and promises to pay Borrower's joint and several liability under said Promissory Note, Deed of Trust, Assignment of Rents, security instruments, and any and all other collateral documents, as herein changed, amended, altered and modified.

BORROWER further agrees that this Modification shall in no way affect or otherwise release any collateral held by the Lender as security for said Promissory Note or any other evidence in indebtedness, but acknowledges and agrees that any and all collateral held by the Lender as security for said Promissory Note and other evidences of indebtedness shall continue to secure same to the extent and in the same manner as if the foregoing Modification had not been effected.

IN WITNESS WHEREOF the undersigned has hereby executed or have caused this instrument to be executed as of the day and year first above written.

SIGNATURE PAGES TO FOLLOW:

**BORROWER:**

**APPALACHIAN SPRINGS, LLC,**
**a Limited Liability Company**

JOHN WEAR, Member

DAVID WEAR, Member

RICHARD PERRY, Member

DEBBIE PERRY, Member

STATE OF TENNESSEE

COUNTY OF _Knox_

Before me, a Notary Public of the state and county aforementioned, personally appeared JOHN WEAR, DAVID WEAR, RICHARD PERRY, and DEBBIE PERRY, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath, acknowledged themselves to be the Members of **APPALACHIAN SPRINGS, LLC, a Tennessee Limited Liability Company**, the within named bargainor, and that JOHN WEAR, DAVID WEAR, RICHARD PERRY, and DEBBIE PERRY executed the foregoing instrument for the purpose therein contained, by signing the name of the company as such Members.

WITNESS my hand and seal this the ___7___ day of _July_ , 2021.

Notary Public

My commission expires: _7-26-23_

**LENDER:**

**MOUNTAIN COMMERCE BANK**

By: _____

Its: _EVP/ Area President_

STATE OF TENNESSEE

COUNTY OF _Knox_

     Before me, a Notary Public in and for the state and county aforementioned, personally appeared _Tim A. Topham_, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), which is a _EVP_ of **MOUNTAIN COMMERCE BANK**, the within named bargainor, a Tennessee Banking Corporation, and that he or she, as such _EVP_ executed the foregoing instrument for the purpose therein contained, by signing the name of the corporation by himself or herself as _EVP_

     WITNESS my hand and seal at office this _7_ day of _July_, 2021.

Notary Public
My Commission Expires: _11-2-2024_

**EXHIBIT "A"**

**TRACT ONE (Tax ID No. 094-156):**

SITUATED in District No. Five (5) of Sevier County, Tennessee, and being a 9.16 acre tract mostly located on the north side of Mill Creek and a portion of the property located on the south side of Mill Creek, and being on the northwest side of Ogle Drive, and being more particularly described as follows:

BEGINNING at an iron rod (old) located on the northwest side of Ogle Drive at its intersection with Tinker Hollow Road, corner to land of John P. Wear, et al (Plat Book 34, Page 251) and on the west side of Ogle Drive; thence from said point of beginning and with the line on the south side of Mill Creek, and a common line with John P. Wear, et al, North 82 deg. 39 min. 31 sec. West, 200 feet to an iron rod (old); thence continuing with the line of John P. Wear, North 59 deg. 31 min. 58 sec. West, 77.75 feet to an iron rod (old); thence North 33 deg. 50 min. 53 sec. East, 13.74 feet to a point in the approximate center of Mill Creek; thence continuing with the line of Mill Creek and the line of John P. Wear, North 53 deg. 08 min. 01 sec. West, 112.68 feet to a point in the center of Mill Creek, said point being located North 20 deg. 09 min. 48 sec. East, 16.05 feet from an iron rod (old) on the south side of Mill Creek; thence continuing with the center of Mill Creek, North 74 deg. 39 min. 53 sec. West, 150.29 feet to a point in the center of Mill Creek, the center point being located North 17 deg. 54 min. 00 sec. East, 13.79 feet from an iron rod (old) located on the south bank of Mill Creek; thence continuing with the center of Mill Creek, South 81 deg. 42 min. 34 sec. West, 91.97 feet to a point in the center of Mill Creek; thence continuing with the center of Mill Creek, North 65 deg. 13 min. 39 sec. West, 100.74 feet to a point, corner of Wear property (Plat Book 32, Page 84); thence with the line of Wear property and the center of Mill Creek, North 62 deg. 20 min. 06 sec. West, 101.00 feet to a point in the center of Mill Creek; thence leaving Mill Creek, South 27 deg. 42 min. 51 sec. West, 20.0 feet to an iron rod (N) on a common line with Wear property; thence continuing with the Wear property, South 27 deg. 43 min. 02 sec. West, 606.27 feet to an iron rod (old) on the line of D.L. Cole (Book 1280, Page 61); thence with the line of Cole, North 05 deg. 33 min. 28 sec. East, 137.35 feet to an iron rod (old); thence continuing with the line of Cole, North 83 deg. 58 min. 55 sec. West, 94.21 feet to an iron rod (old), corner of Phillips, being the David Ogle Farm (Plat Book 4, Page 109); thence with the line of Phillips, North 26 deg. 41 min. 28 sec. East, 532.51 feet to an iron rod (old) on the south bank of Mill Creek; thence North 26 deg. 41 min. 29 sec. East, 31.29 feet to a point in the center of Mill Creek and on the line of OHI Asset (TN) Pigeon Forge, LLC (Book 4803, Page 156); thence with the center of Mill Creek, South 50 deg. 56 min. 38 sec. East, 69.35 feet to a point in the center of Mill Creek; thence leaving the center of Mill Creek with the line of OHI Asset (TN) Pigeon Forge, LLC, North 55 deg. 56 min. 22 sec. East, 66.00 feet to an iron rod (old); thence continuing with said line of OHI Asset (TN) Pigeon Forge, LLC, North 55 deg. 56 min. 22 sec. East, 446.13 feet to an iron rod (old), corner to Earnest Ogle, et ux (Book 257, Page 303); thence with the line of Earnest Ogle, et ux, North 56 deg. 12 min. 14 sec. East, 99.80 feet to an iron rod (old), corner of Frank Wear, Jr. property (Large Map Book 7, Page 125); thence leaving the line of Cole and with the line of Frank Wear, Jr. property, South 33 deg. 12 min. 14 sec. East, 572.88 feet to an iron rod (old); thence North 41 deg. 18 min. 02 sec. East, 232.71 feet to an iron rod (old) at a cedar; thence North 48 deg. 52 min. 39 sec. West, 31.18 feet to a metal post; thence continuing with the line of Frank Wear, Jr. property, North 41

deg. 22 min. 39 sec. East, 165.43 feet to an iron rod (old); thence continuing with the line of the Frank Wear, Jr. property, South 49 deg. 04 min. 56 sec. East, 140.05 feet to an iron rod (old) on the northwest side of Ogle Drive; thence with the northwest side of Ogle Drive, South 42 deg. 26 min. 07 sec. West, 292.68 feet to a point of curvature; thence continuing with the curve on the northwest side of Ogle Drive, with the curve having a chord bearing distance of South 36 deg. 41 min. 34 sec. West, a radius of 682.21 feet, an arc length of 136.76 feet, and a chord length of 136.53 feet to a point; thence continuing with the northwest right of way line of Ogle Drive, South 30 deg. 57 min. 00 sec. West, 95.24 feet to the point of BEGINNING, containing 9.16 acres, more or less, according to survey of WC Whaley, Inc., Engineering and Surveying, dated February 17, 2017.

A portion of said property herein described lies within the flood zone AE and is within the floodway, as shown on the flood insurance rate map number 47155CD241E, which bears an effective date of May 18, 2009, and are in a special flood hazard area base flood elevations for this site vary from 1015.9-1019.0 feet.

**TRACT TWO (Tax ID No. 094-151.04):**

LOT 1: SITUATED in District No. Five (5) of Sevier County, Tennessee, and within the limits of the City of Pigeon Forge, Tennessee, and lying on the west side of Ogle Drive and on the south side of Mill Creek, being property shown on map of record in Plat Book 34, Page 251, in the Register's Office for Sevier County, Tennessee, and being more particularly described as follows:

BEGINNING at an existing iron rod with plastic cap with number 688 at the northeasterly corner of the property, located on the westerly right of way of Ogle Drive just south of Mill Creek and being North 72 deg. 58 min. West, 22.2 feet from the intersection of the centerlines of Ogle Drive and Tinker Hollow Road; thence South 28 deg. 48 min. 04 sec. West, 106.99 feet along the westerly right of way of Ogle Drive, to an existing iron rod; thence 123.19 feet continuing along the westerly right of way of Ogle Drive and along a curve to the left having a radius of 1,103.56 feet and a chord bearing and distance of South 25 deg. 30 min. 05 sec. West, 123.12 feet to an existing iron rod at the common corner of Lot 2; thence leaving the westerly right of way of Ogle Drive and along the common line of Lots 1 and 2, the following four calls: North 64 deg. 31 min. 50 sec. West, 286.68 feet to an existing 5/8" iron rod; thence North 34 deg. 35 min. 46 sec. West, 170.91 feet to an existing 5/8" iron rod; thence North 55 deg. 59 min. 32 sec. West, 155.69 feet to an existing 5/8" iron rod; thence North 13 deg. 44 min. 50 sec. West, 25.00 to a point in Mill Creek and in the common line with Owens; thence leaving the common line of Lots 1 and 2 and along Mill Creek and the common line with Owens, the following four calls: North 81 deg. 39 min. 14 sec. East, 92.04 feet to a point in Mill Creek, being North 18 deg. 48 min. 13 sec. East, 14.02 feet from an existing 5/8" iron rod set as an offset point on the southerly bank of Mill Creek; thence South 74 deg. 36 min. 47 sec. East, 149.82 feet to a point in Mill Creek, being North 19 deg. 45 min. 31 sec. East, 16.05 feet from an existing 5/8" iron rod as an offset point on the southerly bank of Mill Creek; thence South 53 deg. 07 min. 01 sec. East, 112.89 feet to a point in Mill Creek; thence South 33 deg. 49 min. 45 sec. West, 13.74 feet leaving Mill Creek to a set 5/8" iron rod with plastic cap on the southerly bank of Mill Creek; thence South 59 deg. 33 min. 24 sec. East, 77.75 feet, continuing with the common line of Owens and along a line south

of Mill Creek, to an existing iron rod with plastic cap; thence South 82 deg. 40 min. 32 sec. East, 199.97 feet, continuing with the common line of Owens and along a line south of Mill Creek, to the point of BEGINNING, containing 2.085 acres, more or less; bearings based on Tennessee State Grid determined by survey grade RTK GNSS.

## TRACT THREE (Tax ID No. 094-151):

LOT 2: SITUATED in District No. Five (5) of Sevier County, Tennessee, and within the limits of the City of Pigeon Forge, Tennessee, and lying on the west side of Ogle Drive and on the south side of Mill Creek, being south of and adjacent to Lot 1 (herein described) and being more particularly described as follows:

To reach the point of BEGINNING, commence at an existing iron rod with plastic cap with number 688 at the northeasterly corner of Lot 1, located on the westerly right of way of Ogle Drive just south of Mill Creek and being North 72 deg. 58 min. West, 22.2 feet from the intersection of the centerlines of Ogle Drive and Tinker Hollow Road; thence South 28 deg. 48 min. 04 sec. West, 106.99 feet along the westerly right of way of Ogle Drive to an existing iron rod; thence 123.19 feet continuing along the westerly right of way of Ogle Drive and along a curve to the left having a radius of 1,103.56 feet and a chord bearing and distance of South 25 deg. 30 min. 05 sec. West, 123.12 feet to an existing iron rod at the common corner of Lot 2, being the true point of BEGINNING; thence 144.04 feet continuing along the westerly right of way of Ogle Drive and along a curve to the left having a radius of 570.00 feet and a chord bearing and distance of South 15 deg. 27 min. 25 sec. West, 143.66 feet to a point; thence South 07 deg. 27 min. 29 sec. West, 154.54 feet continuing along the westerly right of way line of Ogle Drive to an existing iron rod with plastic cap stamped 2340 at the common corner with Brookstone Village; thence leaving the westerly right of way of Ogle Drive and along the common line with Brookstone Village, the following eight calls: North 76 deg. 07 min. 10 sec. West, 55.32 feet to an existing iron rod with plastic cap stamped "Cowart"; thence North 10 deg. 59 min. 11 sec. East, 46.32 feet to an existing iron rod with plastic cap stamped "Cowart"; thence North 40 deg. 39 min. 40 sec. West, 136.13 feet to an existing iron rod; thence North 37 deg. 39 min. 49 sec. West, 91.77 feet to an existing iron rod; thence North 36 deg. 42 min. 43 sec. West, 195.70 feet to an existing 1/2" iron rod; thence North 35 deg. 44 min. 04 sec. West, 123.80 feet to an existing 5/8" iron rod; thence North 53 deg. 46 min. 45 sec. West, 93.75 feet to an existing 5/8" iron rod; thence North 73 deg. 42 min. 44 sec. West, 128.42 feet to an existing iron pipe in the common line of Keesha M. Wear; thence North 27 deg. 30 min. 44 sec. East, passing an existing 5/8" iron rod at 126.79 feet and proceeding a total 146.61 feet along the common line of Keesha M. Wear to a point in Mill Creek Road and the common line of Owens; thence South 62 deg. 33 min. 59 sec. East, 100.82 feet along the common line of Owens and in Mill Creek to a point being the common corner with Owens and Lot 2; thence leaving Mill Creek and proceeding along the common line with Lot 1, the following four calls: South 13 deg. 44 min. 50 sec. West, 25.00 feet to an existing 5/8" iron rod; thence South 55 deg. 59 min. 32 sec. East, 155.69 feet to an existing 5/8" iron rod; thence South 34 deg. 35 min. 46 sec. East, 170.91 feet to an existing 5/8" iron rod; thence South 64 deg. 31 min. 50 sec. East, 286.68 feet to the point of BEGINNING, containing 2.494 acres, more or less; bearings based on Tennessee State Grid determined by survey grade RTK GNSS.

BEING the same property conveyed to Appalachian Springs, LLC, a Tennessee Limited Liability Company, by Deed dated November 20, 2019, recorded November 25, 2019, and of record in Deed Book 5436, Page 192, in the Register's Office for Sevier County, Tennessee.

# EXHIBIT E

| 5 PGS : QUIT CLAIM DEED | |
| --- | --- |
| CHRISTY VALENTINE   575953 - 21042227 | |
| 11/02/2021 - 02:43 PM | |
| VALUE | |
| MORTGAGE TAX | 0.00 |
| TRANSFER TAX | 0.00 |
| RECORDING FEE | 25.00 |
| DP FEE | 2.00 |
| REGISTER'S FEE | 0.00 |
| TOTAL AMOUNT | 27.00 |

STATE of TENNESSEE, SEVIER COUNTY
CYNDI B PICKEL
REGISTER OF DEEDS

This Instrument Prepared by:
R. Scott Pearson, Attorney
The Pearson Law Firm, PLLC
8904 Sony Lane
Knoxville, Tennessee 37923

## QUITCLAIM DEED

THIS DEED made and entered into this the _27th_ day of _October_____, 2021, by and between **APPALACHIAN SPRINGS, LLC,** a Tennessee Limited Liability Company, hereinafter known as Party of the First Part, and **KEESHA M. WEAR,** hereinafter known as the Party of the Second Part;

### WITNESSETH:

THAT for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, receipt of which is hereby acknowledged, and other good and valuable consideration, the Party of the First Part has this day quitclaimed, and do by these presents hereby quitclaim, transfer and convey unto the Party of the Second Part, their heirs and assigns, all of their right, title, and interest in and to the hereinafter described real estate and more particularly described as follows, to-wit:

SITUATED in District No. Five (5) of Sevier County, Tennessee, and within the limits of the City of Pigeon Forge, Tennessee, and being more particularly described as follows:

BEGINNING at an iron pin, said iron pin being the common southwest corner of the property herein described and the southeast corner of property now or formerly owned by Kenny Phillips and wife, Pamela Phillips (Book 1584, Page 244), said iron pin also being located in the northern line of property now or formerly owned by Glinda Mae Hale (Book 5020, Page 117); thence leaving the line of Hale and running with the property of Phillips, North 26 deg. 41 min. 28 sec. East, 532.51 feet to an iron pin; thence North 26 deg. 41 min. 28 sec. East, 31.29 feet to an iron pin located in Mill Creek, thence running with Mill Creek, South 50 deg. 56 min. 38 sec. East, 69.35 feet to an iron pin, said iron pin also being the severance line of the remaining lands of Appalachian Springs, LLC (Book 5436, Page 192); thence with the line of Appalachian Springs, LLC, South 51 deg. 02 min. 36 sec. East, 83.02 feet to an iron pin, said iron pin being the common northwest corner of property now or formerly owned by Keesha M. Wear (Book 3889, Page 286); thence with the line of Wear, South 27 deg. 42 min. 51 sec. West, 20.00 feet to an iron pin; thence South 27 deg. 43 min. 02 sec. West, 606.27 feet to an iron pin in the line of property now or formerly owned by Glinda Mae Hale (Book 5020, Page 117); thence with the line of Hale, North 05 deg. 33 min. 28 sec. East, 137.35 feet to an iron pin; thence North 83 deg. 58 min. 55 sec. West, 94.21 feet to an iron pin, the point of BEGINNING, containing 1.82 acres, more or less, according to survey of Michael Suttles, Advanced Land Solutions, dated January 21, 2020.

DESIGNATED as Tax ID No. 094-156.00 (portion of)

BEING a portion of the same property conveyed to Appalachian Springs, LLC, a Tennessee Limited Liability Company, by Deed dated November 20, 2019, recorded November 25, 2019, and of record in Deed Book 5436, Page 192, in the Register's Office for Sevier County, Tennessee.

**THE PREPARER OF THIS INSTRUMENT MAKES NO REPRESENTATION AS TO THE STATUS OF TITLE OF THE SUBJECT PROPERTY HEREIN CONVEYED. A TITLE EXAMINATION WAS NOT CONDUCTED FOR THIS CONVEYANCE. THE PREPARER MAKES NO REPRESENTATION AS TO THE ACCURACY OF THE LEGAL DESCRIPTION OTHER THAN IT IS ACCURATELY TRANSCRIBED FROM THE PRIOR DEED OR PLAT OF RECORD. THIS INSTRUMENT WAS PREPARED AT THE REQUEST OF THE PARTIES OF THE FIRST AND SECOND PART.**

THIS CONVEYANCE is made subject to all applicable restrictions, easements, building setback lines and conditions of record in said Register's Office.

This instrument and the interest hereby released and quit-claimed are subject to such limitations, restrictions and encumbrances as may affect the premises.

WITNESS the following signature on this day and year first above written.

APPALACHIAN SPRINGS, LLC,
a Tennessee Limited Liability Company

By: _Richard A. Perry_

Its: _PRESIDENT_

STATE OF TENNESSEE

COUNTY OF _Knox_

Before me, the undersigned authority, notary of the state and county mentioned, personally appeared _Richard H Perry_, and who, upon oath, acknowledged such person to be a _President_ of **APPALACHIAN SPRINGS, LLC, a Tennessee Limited Liability Company**, the within named bargainor, and that such _Richard H. Perry_, as such _President_, executed the foregoing instrument for the purpose therein contained, by personally signing the name of the Tennessee Limited Liability Company, as such _President_.

WITNESS my hand and official seal, this the _27_ day of _October_, 2021.

_Deborah A. McGhee_
Notary Public

My Commission Expires: _7-26-23_

STATE OF TENNESSEE

COUNTY OF _Knox_

I hereby swear or affirm that the actual consideration for this transfer or value of the property transferred, whichever is greater, is **$0.00**, which amount is equal to or greater than the amount which the property transferred would command at a fair and voluntary sale.

WITNESS my hand, this the _27_ day of _October_, 2021.

_Richard H Perry_
Affiant

WITNESS my hand and official seal, this the _27_ day of _October_, 2021.

_Deborah A. McGhee_
Notary Public

My Commission Expires: _7-26-23_

OWNER AND RESPONSIBLE TAXPAYER:
KEESHA M. WEAR
3419 COLE STREET
PIGEON FORGE, TENNESSEE 37863

## CERTIFICATE OF AUTHENTICY
### (True Copy Certification)

I, R. Scott Pearson, do hereby make oath that I am a licensed attorney and / or custodian of the original version of the electronic document tendered for registration herewith and that this electronic document is a true and exact copy of the original document executed and authenticated according to law on 2ND DAY OF NOVEMBER, 2021.

R. Scott Pearson, Attorney – NOVERMBER 2, 2021

STATE OF TENNESSEE
COUNTY OF KNOX

Sworn and subscribed before me on 2ND DAY OF NOVEMBER, 2021.

Jacqueline Paige Slusher, Notary Public

# EXHIBIT F



YEARS OF FORGING PROGRESS

**PIGEON FORGE**
T·E·N·N·E·S·S·E·E

## Notice of Public Meeting for Westside Connector Project From Pine Mountain Road to West Mill Creek Road City of Pigeon Forge

The City of Pigeon Forge will host a Public Meeting on October 26th to gather public input on the proposed Westside Connector roadway improvement project. This project will build a two-lane local road with sidewalks on new alignment between Pine Mountain Road and West Mill Creek Road. The general project location is shown on the map below. The purpose of the project is to construct a north-south local road with sidewalks to provide a local route that is an alternative to the Parkway and better serve the residents of Pigeon Forge.

The meeting will be held on Tuesday, October 26th from 5:00 PM to 7:00 PM in Meeting Room B at the Pigeon Forge City Hall Complex 3221 Rena Street Pigeon Forge, TN 37863.

The public is invited to ask questions and make comments during the meeting. Representatives of the City of Pigeon Forge will be present to provide information and answer questions on any aspect of this proposed project.



# Notice of Public Meeting

## for

## Westside Connector Project
### From Pine Mountain Road to West Mill Creek Road
### City of Pigeon Forge

The City of Pigeon Forge will host a Public Meeting on October 26th to gather public input on the proposed Westside Connector roadway improvement project.

This project will build a two-lane local road with sidewalks on new alignment between Pine Mountain Road and West Mill Creek Road. The general project location is shown on the map below. The purpose of the project is to construct a north-south local road with sidewalks to provide a local route that is an alternative to the Parkway and better serve the residents of Pigeon Forge.



The meeting will be held on **Tuesday, October 26th** from **5:00 PM** to **7:00 PM** in

**Meeting Room B at the Pigeon Forge City Hall Complex**
**3221 Rena Street**
**Pigeon Forge, TN 37863**

The public is invited to ask questions and make comments during the meeting. Representatives of the City of Pigeon Forge will be present to provide information and answer questions on any aspect of this proposed project.

# EXHIBIT G

# Subject: RE: Meet

**Mize, Jeff** <mizerj@cdmsmith.com>

to Eric Brackins

Yes, I could meet on Monday at 9am.  Meet at city hall?

Thank you,

_____

**Jeff Mize, PE**
Associate
CDM Smith
1100 Marion St, Suite 300; Knoxville, TN 37921
Office: 865.963-4342 | Mobile: 865.617-3794
MizeRJ@CDMSmith.com
cdmsmith.com

**From:** Eric Brackins <ebrackins@cityofpigeonforgetn.gov>
**Sent:** Thursday, October 28, 2021 10:01 AM
**To:** Mize, Jeff <mizerj@cdmsmith.com>
**Subject:** Meet

Jeff,
Morning.  Would you have time to meet at 9am next Monday or Tuesday with John Wear regarding the Campgrou
is being built on the Westside Connector route? Let me know when you can.
Thanks

Eric Brackins
Assistant City Manager
City of Pigeon Forge
865-429-7323



# EXHIBIT H


SHOWDOWN

PAGE A5

SEVIERVILLE    PIGEON FORGE    GATLINBURG    SEVIER COUNTY

The Mountain
# Press

Thursday, October 28, 2021 ◆ Vol. 36, No. 219    www.themountainpress.com ◆ $1


Photos by Cindy Simpson/The Mountain Press
Andrew Holt, the son of General Sessions Clerk Connie Holt, remembers his mother during a vigil in her honor Tuesday night. Andrew called his mother a role model for integrity and empathy.

# Holt remembered at vigil

BY CINDY SIMPSON
EDITOR

SEVIERVILLE — General Sessions Clerk Connie Holt was remembered for her loving nature during a prayer vigil in her memory Tuesday evening at the Sevier County Courthouse.

Her son Andrew Holt reflected on his mother's impact in the community, not just as a public figure, but as a mother, grandmother, daughter, and friend. He called her a role model for integrity and empathy.

He thanked the hundreds in attendance that evening.

"I know my mom would feel greatly honored and loved," Andrew Holt said.

Connie Holt, who celebrated her 55th birthday Friday, was found dead Sunday afternoon at her Eagle View Drive home, along with her fiance, Eric Michael Peters. The TBI is investigating the deaths.

Holt's death shook the community, as she was a beloved county employee and community member.

"All of us here knew Connie and loved Connie, and she brought so much joy into all our lives," Sevier County Mayor Larry Waters said.

Waters said Holt was a special person who always had a smile and kind word that would raise people's spirits.

Not only did her loving spirit lift up others, but she helped

SEE HOLT/PAGE A8


Maureen Fox, right, waits as her candle is lit at a vigil for Connie Holt. She is among hundreds who came to remember the general sessions clerk.


Andrew Holt becomes emotional while talking about his mother, Connie Holt.

# Marriott hotel confirmed for 407 development

BY GREG WILKERSON
EXECUTIVE EDITOR

SEVIERVILLE — A new hotel from a national chain was confirmed Tuesday for the 407 Gateway to Adventure project currently underway by the Eastern Band of Cherokee Indians near the interstate.

Matthew Cross of OE Experience, who is working with Kituwah LLC and ERCI on the project, spoke about the development to members of the Board of Mayor and Alderman and city staff during a workshop retreat Tues-

day at the Sevierville Convention Center.

"I can also confirm for the first time today that Marriott will have a presence at the 407 through Kituwah as a direct, self-developed property. The goal is that that's going to be a Marriott Courtyard property," Cross said. "Marriott Courtyard will be publicly announced imminently, and will serve as the first lodging on that property."

Unlike the Bruce's convenience center

SEE HOTEL/PAGE A7


Jeff Farrell/The Mountain Press
The meeting, seeking public input, drew more than 30 people with a direct interest in the routes. The city provided maps at the tables to help them review the proposals in detail.

# PF Westside Connector routes draw scrutiny

BY JEFF FARRELL
STAFF WRITER

PIGEON FORGE — More than 30 people came to a city meeting Tuesday evening to give their opinions on the two routes under consideration for a new Westside Connector Road.

While city commission had been looking at three different possible routes for the road, it eliminated one of three possibilities before

Tuesday's meeting.

That left two routes: one that goes south of Freedom Baptist Church and stays along Mill Creek, and one that goes north around the church and then runs parallel to the other.

Both routes merge after passing Singing Pines Road, and continue along the creek until they reach Mill Creek

SEE ROUTES/PAGE A6

---

## Whaley, named to Pigeon Forge commission, resigns county post

BY JEFF FARRELL
STAFF WRITER

SEVIERVILLE — After Pigeon Forge City Commission selected him to fill a vacancy created when Ken Maples resigned, Keith Whaley has submitted his resignation from Sevier County Commission.

Maples resigned in the middle of his four-year term. Whaley will fill the city position until the next city election in 2022.

Whaley is an optometrist and lives and works in Pigeon Forge. He served on the city commission from 2007 until 2011, and commissioners selected him to act an im go to for all four years.

He said he's looking forward to working with the city commission.

"I've looked at what they've done,"

he said. "I've thought I would like to work with that board. I would never run against them."

With the move seat, he had an opportunity to return to the city without doing that and decided to take it, he said.

He will likely be sworn in and begin serving at the city commission's next regular meeting, which is coming up on Nov. 9.

In the meantime, he said he hopes to study up on the issues the city is facing.

"I obviously know a lot that's going on in Pigeon Forge, but I'm going to take the next few weeks to dive and see what's going on with the commission," he said.

SEE WHALEY/PAGE A8

---

## Mountain Hope clinic receives Project Finish Line grant

BY STAFF REPORTS
SEVIERVILLE — Mountain Hope Good Shepherd Clinic received a grant to help them educate the public about the coronavirus.

Project Finish Line is an initiative to give vulnerable and often overlooked populations accurate information about the coronavirus to allow individuals to make an informed decision regarding their involved with receiving vaccination.

Joe Aguada, CEO of Sostento and creator of Project Finish Line vis-

Partnering with Tennessee Charitable Care Network, Mountain Hope Good Shepherd Clinic is one of 100 clinics across the nation that was chosen to participate in "Project Finish Line."

ited the clinic and met with staff recently after giving Mountain Hope the award.

The goal was to provide operational support, communication assistance, and technical tools to help answer the questions the community may have about the vaccine. The grant put togeth-

er a toolkit for clinics to use that addresses the questions and concerns.

Mountain Hope Good Shepherd Clinic is a ministry clinic that provides quality health care for the medically uninsured and

SEE CLINIC/PAGE A7

---

WHAT'S INSIDE
Calendar          A2
Classifieds       A8-9
Comics            A10
Local and State   A3
Sports            A5
Weather           A3

WEATHER WATCH

Minimum Gonzales
Pigeon Forge - Thursday

Betsy Jane Allen
Gary Joy Goins
Connie L. Rauch Holt
Zachary Kanewske
Earl Lloyd Keck-Il
Wanda Phyllis Murie
James Christopher

"Chris" Miller
Robin Owens
Moueen ?er
Robert L. Saunders
Ashley Noel Walsh
Anna Weaver
Page A4

STAY CONNECTED
 facebook.com/ TheMountainPress
 @themtnpress

## LETTER TO THE EDITOR

### In honor of Don Kirk

Editor:

It is with great sadness we announce the loss of my friend and mentor Don Kirk who passed away on Sunday, Oct. 24, after a lengthy illness. Don and Leah Kirk have been friends and long-time sponsors through Southern Trout magazine for many years to the Great Smoky Mountains Trout Unlimited chapter and he will be missed.

Don has been a personal friend for many years and has given myself and our chapter many opportunities to expand our outreach in the world of the outdoors. As an author, publisher, editor and writer of both books and magazines over his long career, he has educated and entertained millions of people.

He was always a determination that the stories and the people of the Great Smoky Mountains history

for told and honored and not forgotten. It was the driver that motivated Don to start the annual Southern Trout Magazine's "Legends of the Fly" Hall of Fame held each year at the Atlanta Fly Fishing Show for years. I was honored to be the master of ceremonies every year and was able to travel and come to know more of the greats in the fishing business of Don's friendship.

Don was scheduled to receive his long deserved place next week on Nov. 5-6 at the fly Fishing Museum Hall of Fame event in Bryson City, North Carolina. His family will accept the award in his honor and I look forward to being a part of this event.

We send our prayers and thoughts to his wife, Leah Kirk and the Kirk family.

**John Reinhardt**
President
Great Smoky
Mountain Trout
Unlimited

## TRICK-OR-TREAT ALTERNATIVES

**THURSDAY, OCT. 28**

**Pigeon Forge Spooktacular**
The Pigeon Forge Spooktacular, featuring trick-or-treating, activities and contests will be from 3 to 8 p.m. at the Pigeon Forge Community Center. Families can also do a scavenger hunt which will take this weekend the community.

**SATURDAY, OCT. 30**

**Quality Plumbing Trunk-or-treat**
Quality Plumbing, Heating and Cooling is hosting a Trunk or Treat and Fall Festival for all of the community from 2 to 5 p.m. The event will include food, games, bounce houses, a bounce obstacle course and trunk-or-treating. The event is at their office, 455 Dolly Parton Lane, Kodak.

## ROUTES

FROM PAGE A1

Road, and would then go to the Parkway.

City officials have said the two-lane road is intended to provide local drivers with an alternative to driving along the busy Parkway. The six-lane thoroughfare serves as the main route through town for tourists visiting attractions in the city as well as traffic to and from Gatlinburg and the Great Smoky Mountains National Park.

The connector would provide a wide, two-lane road with sidewalks and paved paths.

"We're trying to maintain impacts on the neighborhood," said Jeff Mize, a roadway engineer from CDM Smith who presented the plans.

"We want to build a road that serves the neighbors, that gives you sidewalks, that gives you a good north-south option for the Parkway, that lets you get around."

None of the residents who came to the meeting disagreed with the goal or adding a new road, although several pointed out that tourists would quickly find the alternative route when the Parkway is congested, using GPS apps available on most mobile devices.

There was some division, however, on which of the routes would be preferred.

Residents got a chance to ask questions about the two routes and to voice opinions, and were encouraged to leave posted notes on maps that voiced their opinions or concerns.


Mayor David Wear addresses the meeting.

Many appeared to support the southern route.

Mark Ratthuff, a deacon from Freedom Baptist, said the church had been aware for decades that the city wanted to build a West-side Connector and has been operating on the assumption it would go south of the church.

"We've been planning for the last 20 years for it to go down there," he said.

The Vee felt that area vacant, while the northern route would go through a playground, some of the church and some of the building with an eye to expansion at their campus.

Some business owners along the north route said it would affect their parking and traffic flow, and that they would prefer the city use the southern option.

Officials for Pigeon Forge Care and Rehab also noted they preferred the southern route, along with several homeowners.

Meanwhile, some of Mayor David Wear's family have been working on property along the southern route with plans to open a camp-

ground there.

Wear said he doesn't have a financial interest in that plan, although his brother does.

"I will abstain from any vote that may carry a perceived conflict of interest," Wear said.

"Although there is no direct conflict, I am not going to lobby for routes that may affect my family and I'll abstain on land purchases affecting family land, but I plan on casting a vote to fund the project."

His father Jerry Wear, as well as some other residents at the meeting, also noted the southern route would be running along the floodplain and runoff could affect Mill Creek.

The notes left at the meeting appeared in favor the southern route, which impacted less property despite running along the water.

"If the road goes through there it will destroy the campground," Jerry Wear said.

That vote should have decisions have already been made on which route to use, he said.

Contact Jeff at jfarrello.themountainpress.com or Twitter at @jeffdrompress

— submitted

## WEEK

FROM PAGE A2

pre-apprenticeship type position. After graduation they can move into a four-year apprenticeship program to become a journeyman electrician.

Even if a student does not do the pre-apprenticeship path, they may still apply to the apprenticeship program with a head start over those with no experience.

This program will leave students working during the day full time and attending the apprenticeship school one to two nights a week for four years. Currently SCHS has two graduated students enrolled in the Fundertek program that are doing well and we hope to have more enrolling at the end of this school year.

With programs like the junior apprenticeship programs, students are given the combination of an the job training with either Trade School or some specific college courses. Careful planning with all the right information could save families money and help the local economy and potential to give a young person a jump start on their future.

The Administration and faculty of Sevier County High School have worked diligently to provide opportunities for students to earn college credit while in high school. Many of these programs are at a reduced cost or no cost for students and parents. SCHS is providing a variety of opportunities to prepare students for their technical or college coursework, entry into the work force or military careers.

— submitted



## Volunteer CHEVROLET

865.428.6655

## SLASH 'O' WEEN

WE'VE SLASHED PRICES ON PRE-OWNED VEHICLES!

| 2019 VW ATLAS 3.6 S | 2019 CHEVY 4X4 COLORADO LR2 | 2020 GMC ACADIA DENALI | 2019 NISSAN ROGUE SPORT SL | 2018 CHEVY IMPALA LT | 2019 CHEVY SILVERADO LT | 2019 FORD 4EN F150 KING RANCH |
|---|---|---|---|---|---|---|
| $26,588 | $47,947 | $42,675 | $30,884 | $19,978 | $38,755 | ~~$58,747~~ $53,460 |

| 2018 CADILLAC XTS PLATINUM | 2019 FORD 4EN F150 LARIAT | 2019 BUICK VERANO SPORT TOURING | 2019 RAM 4X4 1500 SLT | 2020 CHEVY SILVERADO LT | 2019 CHEVY SILVERADO RST |
|---|---|---|---|---|---|
| | $44,738 | $17,950 | $36,983 | ~~$39,840~~ $45,524 | ~~$49,877~~ $53,455 |
| $42,978 | | | | | |

| 2019 JEEP 4X4 WRANGLER SPORT | 2019 JEEP 4X4 WRANGLER SPORT | 2011 ACURA RDX | 2020 CADILLAC XT5 SPORT | 2019 CHEVY SUBURBAN LT |
|---|---|---|---|---|
| ~~$17,988~~ $18,850 | ~~$39,870~~ $42,460 | $27,488 | ~~$59,988~~ $64,850 | $34,988 |

## ARE YOU BURIED IN YOUR TRADE? WE'LL GIVE YOU A SCREAMIN' DEAL FOR IT!

Shop all of our inventory at: **www.volunteerchevrolet.com** FIND NEW ROADS

All sale prices are plus tax, tag, title, $598 document fee and any other applicable dealer fees. See dealer for complete details. Prices may change without notice. Must take delivery by 11/01/21.

# EXHIBIT I

# SWPPP

# STORM WATER POLLUTION PREVENTION PLAN

# APPALACHIAN SPRINGS TROUT FARM & CAMPGROUND PHASE II

370 Ogle Drive
Pigeon Forge, Tennessee 37863
Sevier County Tax Map 094 Parcel 156.00

**FOR:**

Signature Development, LLC
Contact: John Wear



June 16, 2019

**PREPARED BY:**
**CIVIL & ENVIRONMENTAL CONSULTANTS, INC.**
Jeremy M. Puckett, PE – jpuckett@cecinc.com
229 Prince Street
Sevierville, TN 37862

CEC Project 193-728

CITATIONS IN PARENTHESIS INDICATE SECTIONS OF THE CURRENT CGP.

## 1. SWPPP REQUIREMENTS (3.0)

1.1. HAS THE SWPPP TEMPLATE BEEN PREPARED BY AN INDIVIDUAL THAT HAS THE FOLLOWING CERTIFICATIONS (3.1.1) YES ☒ NO ☐ (CHECK ALL THAT APPLY BELOW)

    1.1.1. ☐ CERTIFIED PROFESSIONAL IN EROSION AND SEDIMENT CONTROL (CPESC); OR

    1.1.2. ☒ TDEC LEVEL II

1.2. DO THE EPSC PLANS INVOLVE STRUCTURAL DESIGN, HYDRAULIC, HYDROLOGIC OR OTHER ENGINEERING CALCULATIONS FOR EPSC STRUCTURAL MEASURES (SEDIMENT BASINS, ETC.)? YES ☐ NO ☒ (3.1.1)

IF YES, HAVE THE EPSC PLANS BEEN PREPARED, STAMPED AND CERTIFIED BY A LICENSED PROFESSIONAL ENGINEER OR LANDSCAPE ARCHITECT?

☐ YES ☐ NO ☒ N/A

1.3. DO THE PROJECT STORMWATER OUTFALLS DISCHARGE INTO THE FOLLOWING? (5.4) YES ☒ NO ☐ (CHECK ALL THAT APPLY BELOW)

    1.3.1. ☒ IMPAIRED WATERS (303d FOR SILTATION OR HABITAT ALTERATION)

    1.3.2. ☐ TENNESSEE KNOWN EXCEPTIONAL WATERS

IF YES, HAVE THE EPSC PLANS BEEN PREPARED BY AN INDIVIDUAL WHO HAS COMPLETED TDEC LEVEL II? ☒ YES ☐ NO ☐ N/A (5.4.1.b); AND

IF YES, HAS THE SWPPP TEMPLATE BEEN PREPARED BY AN INDIVIDUAL WHO HAS COMPLETED TDEC LEVEL II? ☒ YES ☐ NO ☐ N/A (5.4.1.b)

## 2. SITE DESCRIPTION (3.5.1)

2.1. PROJECT LIMITS: Project limit are as shown on the EPSC Plans. (3.5.1.g):

2.2. PROJECT DESCRIPTION: (3.5.1.a) The proposed construction activity is the construction of a campground with associated parking.

    TITLE: Appalachian Springs Trout Farm and Campground Phase II

    COUNTY: Sevier County

2.3. SITE MAP(S): REFER TO SITE LOCATION MAP FIGURE 1 (3.5.1.g)

2.4. DESCRIPTION OF EXISTING SITE TOPOGRAPHY (3.5.1.d): Within the project site, the topography varies from 1% to 33%.

2.5. MAJOR SOIL DISTURBING ACTIVITIES (3.5.1.b) (CHECK ALL THAT APPLY)

    2.5.1. ☐ CLEARING AND GRUBBING

    2.5.2. ☒ EXCAVATION

    2.5.3. ☐ CUTTING AND FILLING

    2.5.4. ☒ FINAL GRADING AND SHAPING

    2.5.5. ☒ UTILITIES

    2.5.6. ☐ OTHER (DESCRIBE):

2.6. TOTAL PROJECT AREA (3.5.1.c): 11.83 ACRES

2.7. TOTAL AREA TO BE DISTURBED (3.5.1.c): 6.5 ACRES

IF GREATER THAN 50 ACRES, HAS CONSTRUCTION PROJECT PHASING BEEN SPECIFIED IN SECTION 3 BELOW AND IN THE PLANS (3.5.3.1.k)?

YES ☐ NO ☐ N/A ☒

2.8. ARE THERE ANY SEASONAL LIMITATIONS ON WORK? YES ☐ NO ☒

IF YES, DESCRIBE AND LIST THE CORRESPONDING PLAN SHEET: _____

2.9. SOIL PROPERTIES (3.5.1.e)(4.1.1)

SOIL PROPERTIES FOR THE PRIMARY SOILS ARE LISTED IN THE TABLE BELOW.

| SOIL PROPERTIES | | | |
|---|---|---|---|
| PRIMARY SOIL NAME | HSG | % OF SITE | ERODIBILITY (k value) |
| CaD – Cataska channery silt loam | D | 2.9 | 0.24 |
| Du – Dunning silty clay loam | C/D | 7.9 | 0.32 |
| HnB – Holston loam | B | 6.0 | 0.32 |
| Ro – Rosman sandy loam | A | 37.9 | 0.20 |
| Sb – Sequatchie loam | B | 45.4 | 0.32 |

2.10. PROJECT RUNOFF COEFFICIENTS AND AREA PERCENTAGES (3.5.1.f)

| RUNOFF COEFFICIENTS FOR EXISTING CONDITIONS | | | |
|---|---|---|---|
| AREA TYPE | AREA(AC) | PERCENTAGE OF TOTAL AREA (%) | RUNOFF CN |
| pervious Areas project area | .01 | 0.08 | 55 |
| Total project area | 11.83 | | |

| RUNOFF COEFFICIENTS FOR POST CONSTRUCTION CONDITIONS | | | |
|---|---|---|---|
| AREA TYPE | AREA(AC) | PERCENTAGE OF TOTAL AREA (%) | RUNOFF CN |
| pervious Areas project area | 0.44 | 0.07 | 57 |
| Total project area | 11.83 | 3.72 | |

3. ORDER OF CONSTRUCTION ACTIVITIES (3.5.1.b, 3.5.2.a)
 3.1. INSTALL STABILIZED CONSTRUCTION EXIT AT ALL POINTS OF EGRESS.
 3.2. IDENTIFY LIMITS OF DISTURBANCE, CLEARLY MARK AREAS TO REMAIN UNDISTURBED, INSTALL CAUTION FENCE IF NECESSARY.
 3.3. INSTALL SILT FENCE AND SEDIMENT TRAPS AS SHOWN ON PLANS.
 3.4. PROCEED WITH GRADING ACTIVITIES.
 3.5. STABILIZE DISTURBED AREAS WITHIN 14 DAYS OF COMPLETING ANY PHASE OF ACTIVITY.
 3.6. STABILIZE STEEP SLOPES, 33% OR GREATER, WITHIN 7 DAYS AFTER CONSTRUCTION ACTIVITY ON THE SLOPE HAS TEMPORARILY OR PERMANENTLY CEASED. EROSION CONTROL MATTING IS RECOMMENDED. PERMANENT EROSION CONTROL MATTING IS REQUIRED ON SLOPES 2:1 OR STEEPER.
 3.7. COMPLETE TEMPORARY STABILIZATION (TOPSOIL, SEEDING, MULCH, SOD, ETC)
 3.8. REMOVE TEMPORARY EROSION CONTROLS AND ACCUMULATED SEDIMENT FROM AREAS THAT HAVE ESTABLISHED AT LEAST 70 PERCENT PERMANENT VEGETATIVE COVER.
 3.9. RESEED AREAS DISTURBED BY REMOVAL ACTIVITIES.

4. STREAM, OUTFALL, WETLAND, TMDL AND ECOLOGY INFORMATION
 4.1. STREAM INFORMATION
  WILL CONSTRUCTION AND/OR EROSION PREVENTION AND SEDIMENT CONTROLS IMPACT ANY STREAMS? YES ☐ NO ☒
  4.1.1. STREAM INFORMATION
   4.1.1.1. RECEIVING STREAMS (3.5.1.j) THE ENTIRE AREA DRAINS TO MILL CREEK.

2

4.1.2. ARE BUFFER ZONES REQUIRED? YES ☒ NO ☐ (4.1.2, 5.4.2)

    IF YES, THEY HAVE BEEN INCLUDED ON PLAN SHEET(S) REFER TO THE EROSION CONTROL PLANS DRAWINGS #2 AND #3.

    IF YES, CHECK THE APPROPRIATE BOX BELOW FOR SIZE OF BUFFER

    ☒ 60-FEET FOR IMPAIRED AND EXCEPTIONAL WATERS (AVERAGE WIDTH PER SIDE WITH A MINIMUM OF 30-FEET)

    ☐ 30-FEET FOR ALL OTHER STREAMS (AVERAGE WIDTH PER SIDE WITH A MINIMUM OF 15-FEET)

4.1.3. ARE THERE BUFFER ZONE EXEMPTIONS? YES ☐ NO ☒ (4.1.2.1).

4.2. OUTFALL INFORMATION :

A SEDIMENT BASIN OR EQUIVALENT MEASURE(S) WILL BE PROVIDED FOR ANY OUTFALL IN A DRAINAGE AREA:

4.2.1. OF TEN ACRES OR MORE FOR AN OUTFALL(S) THAT DOES NOT DISCHARGE TO AN IMPAIRED STREAM OR KNOWN EXCEPTIONAL QUALITY WATER (3.5.3.3)

4.2.2. OF FIVE ACRES OR MORE FOR AN OUTFALL(S) THAT DISCHARGES TO AN IMPAIRED STREAM OR KNOWN EXCEPTIONAL QUALITY WATER (5.4.1.f).

4.2.3. ARE EQUIVALENT MEASURES BEING SUBSTITUTED FOR A SEDIMENT BASIN(S)? YES ☐ NO ☒

4.2.4. HAVE ALL OUTFALLS BEEN LABELED ON THE EPSC PLAN SHEETS (3.5.1.g, 5.4.1.f)? YES ☒ NO ☐

4.2.5. HAVE ALL OUTFALLS BEEN LABELED ON A USGS TOPOGRAPHIC MAP INCLUDED IN THE "DOCUMENTATION AND PERMITS" BINDER (2.6.2)?

    YES ☒ NO ☐

4.3. WETLAND INFORMATION

WILL CONSTRUCTION AND/OR EROSION AND SEDIMENT CONTROLS IMPACT ANY WETLANDS? YES ☐ NO ☒

4.4. TOTAL MAXIMUM DAILY LOADS (TMDL) INFORMATION (3.5.10)

4.4.1. IS THIS PROJECT LOCATED IN A WATERSHED THAT MAINTAINS AN EPA APPROVED TMDL FOR SILTATION? YES ☐ NO ☒

4.4.2. IF YES, IS THIS PROJECT LOCATED WITHIN A SUBWATERSHED WITH A WASTE LOAD ALLOCATION (WLA)? YES ☐ NO ☐ N/A ☒

4.4.3. IF YES, DOES THE PROJECT HAVE A DIRECT DISCHARGE TO A 303(d) LISTED STREAM FOR SILTATION OR HABITAT ALTERATION?

    YES ☐ NO ☐ N/A ☒

4.4.4. IF YES, HAS A SUMMARY OF THE CONSULTATION (LETTER) BEEN INCLUDED WITH THE SWPPP DOCUMENTATION? YES ☐ NO ☐ N/A ☒

4.5. ECOLOGY INFORMATION (3.5.5.e)

    ARE THERE STATE OR FEDERALLY LISTED SPECIES LOCATED WITHIN THE PROJECT AREA? SPECIAL NOTES ARE REQUIRED TO DESCRIBE MEASURES NECESSARY TO PREVENT "TAKING" OF LEGALLY PROTECTED STATE OR FEDERALLY LISTED THREATENED OR ENDANGERED AQUATIC FAUNA AND/OR CRITICAL HABITAT.

    YES ☐ NO ☒ NO NOTES REQUIRED ☐

    IF YES, LIST ALL PLAN SHEETS WHERE SPECIAL NOTES HAVE BEEN ADDED. _____

## 5. EROSION PREVENTION AND SEDIMENT CONTROL (EPSC) MEASURES (3.5.3)

5.1. EPSC MEASURES MUST BE DESIGNED, INSTALLED AND MAINTAINED TO CONTROL STORMWATER VOLUME AND VELOCITY WITHIN THE SITE TO MINIMIZE EROSION. (4.1.1)

5.2. EPSC MEASURES MUST CONTROL STORMWATER DISCHARGES, INCLUDING BOTH PEAK FLOWS AND TOTAL STORMWATER VOLUME, TO MINIMIZE EROSION AT OUTLETS, STREAM CHANNELS AND STREAM BANKS. (4.1.1)

5.3. HAVE THE CONTROL MEASURES BEEN DESIGNED ACCORDING TO THE SIZE AND SLOPE OF THE DISTURBED DRAINAGE AREA (3.5.3.3)? YES ☒ NO ☐

5.4. THE CONTROL MEASURES HAVE, AT A MINIMUM, BEEN DESIGNED FOR THE 2-YEAR, 24 HOUR STORM EVENT (3.5.3.3, 5.4.1.a). FOR SITES THAT DISCHARGE INTO AN IMPAIRED OR KNOWN EXCEPTIONAL QUALITY WATER, EPSC MEASURES WILL BE DESIGNED TO CONTROL STORM RUNOFF GENERATED BY A 5-YEAR, 24-HOUR STORM EVENT.

5.5. ARE THE LIMITS OF DISTURBANCE CLEARLY MARKED ON THE EPSC PLANS? (3.5.1.n) YES ☒ NO ☐

5.6. HAVE PHASED EPSC PLANS BEEN PREPARED FOR THE PROJECT? (3.5.2)

    YES ☒ NO ☐ (IF YES, CHECK ONE BELOW)

    5.6.1. ☒ PROJECT DISTURBED AREA IS THAN LESS THAN 5 ACRES (MINIMUM OF TWO PHASES OF EPSC PLANS)

    5.6.2. ☐ PROJECT DISTURBED AREA IS GREATER THAN 5 ACRES (MINIMUM OF THREE PHASES OF EPSC PLANS)

5.7. IS ADDITIONAL PHYSICAL OR CHEMICAL TREATMENT OF STORMWATER RUNOFF NECESSARY (5.4.1.a)? YES ☒ NO ☐

    5.7.1. Equivalent measures are in place in lieu of a sediment pond because the site is so flat and below the 100 flood plain. A double row of silt fence will be place on the lower portion of the site with mulch or straw bales in between.

5.8. HAVE STEEP SLOPES (GREATER THAN 33%) BEEN MINIMALLY DISTURBED AND/OR PROTECTED BY CONVEYING RUNOFF NON-EROSIVELY AROUND OR OVER THE SLOPE? (3.5.3.2) (10 "STEEP SLOPE")

    YES ☒ NO ☐

5.9. ALL PHYSICAL AND/OR CHEMICAL TREATMENT WILL BE RESEARCHED, APPLIED IN ACCORDANCE WITH MANUFACTURE'S GUIDELINES AMD FULLY DESCRIBED ON THE EPSC PLANS (3.5.3.1.b).

5.10. ALL EPSC CONTROL MEASURES WILL BE INSTALLED ACCORDING TO REFERENCED STANDARDS.

5.11. EPSC MEASURES WILL NOT BE INSTALLED IN A STREAM WITHOUT FIRST OBTAINING US COE SECTION 404, TDEC ARAP, AND TVA PERMITS.

5.12. DISCHARGES FROM DEWATERING ACTIVITIES ARE PROHIBITED UNLESS MANAGED BY CONTROLS PROVIDING EQUIVALENT LEVEL OF TREATMENT (FILTRATION) (4.14)

5.13. DISCHARGES FROM SEDIMENT BASINS AND IMPOUNDMENTS MUST USE OUTLET STRUCTURES THAT ONLY WITHDRAW WATER FROM NEAR THE SURFACE OF THE BASIN OR IMPOUNDMENT, UNLESS INFEASIBLE. (4.1.7)

5.14. STABILIZATION PRACTICES

3

PRE-CONSTRUCTION VEGETATIVE COVER WILL NOT BE DESTROYED, REMOVED OR DISTURBED MORE THAN 15 DAYS PRIOR TO GRADING OR EARTH MOVING UNLESS THE AREA WILL BE SEEDED AND/OR MULCHED OR OTHER TEMPORARY COVER IS INSTALLED. (3.5.3.1.h)

5.15. STABILIZATION MEASURES WILL BE INITIATED AS SOON AS POSSIBLE WHERE CONSTRUCTION ACTIVITIES HAVE TEMPORARILY OR PERMANENTLY CEASED. TEMPORARY OR PERMANENT STABILIZATION WILL BE COMPLETED WITHIN 14 DAYS AFTER ACTIVITY HAS TEMPORARILY OR PERMANENTLY CEASED IN THAT AREA. PERMANENT STABILIZATION WILL REPLACE TEMPORARY MEASURES AS SOON AS PRACTICABLE. (3.5.3.2)

5.16. STEEP SLOPES (3.5.3.2)

STEEP SLOPES ARE DEFINED AS A NATURAL OR CREATED SLOPE OF 35% GRADE OR STEEPER REGARDLESS OF HEIGHT. STEEP SLOPES SHALL BE TEMPORARILY STABILIZED NOT LATER THAN 7 DAYS AFTER CONSTRUCTION ACTIVITY ON THE SLOPE HAS TEMPORARILY OR PERMANENTLY CEASED.

## 6. CONSTRUCTION SUPPORT ACTIVITIES – BORROW AND WASTE AREAS (1.2.2)(3.5.3.1.g)

WASTE MATERIAL (EARTH, ROCK, ASPHALT, CONCRETE, ETC) NOT REQUIRED FOR THE CONSTRUCTION OF THE PROJECT WILL BE DISPOSED OF BY THE CONTRACTOR. THE CONTRACTOR WILL OBTAIN ANY AND ALL NECESSARY PERMITS INCLUDING, BUT NOT LIMITED TO NPDES, AQUATIC RESOURCES ALTERATION PERMIT(S) CORPS OF ENGINEERS SECTION 404 PERMITS, AND TVA SECTION 26A PERMITS TO DISPOSE OF WASTE MATERIALS.

## 7. MAINTENANCE AND INSPECTION

7.1. INSPECTION PRACTICES (3.5.8)

7.1.1. INSPECTORS MUST HAVE SUCCESSFULLY COMPLETED THE TDEC FUNDAMENTALS OF EROSION AND SEDIMENT CONTROL COURSE (TDEC LEVEL I) AND MAINTAIN THE CERTIFICATION. A COPY OF THE INSPECTOR'S CERTIFICATION SHOULD BE KEPT ON SITE. (3.5.8.1)

7.1.2. INSPECTIONS WILL BE CONDUCTED AT LEAST TWICE EVERY CALENDAR WEEK AND AT LEAST 72 HOURS APART. (3.5.8.2.a)

7.1.3. THE FREQUENCY OF EPSC INSPECTIONS MAY BE REDUCED TO ONCE A MONTH (I.E. EXTREME DROUGHT CONDITIONS, FROZEN GROUND, ETC.) WITH WRITTEN NOTIFICATION TO LOCAL TDEC OFFICE AND SUBSEQUENT TDEC APPROVAL. WRITTEN NOTIFICATION MUST INCLUDE THE INTENT TO CHANGE FREQUENCY AND JUSTIFICATION. (3.5.8.2.a)

7.1.4. ALL DISTURBED AREAS OF THE SITE THAT HAVE NOT BEEN FINALLY STABILIZED, AREAS USED FOR MATERIAL STORAGE THAT ARE EXPOSED TO PRECIPITATION, STRUCTURAL CONTROL MEASURES, AND LOCATIONS WHERE VEHICLES ENTER OR EXIT THE SITE, AND EACH OUTFALL WILL BE INSPECTED. (3.5.8.2.b)

7.1.5. THE INSPECTOR WILL OVERSEE THE REQUIREMENTS OF OTHER CONSTRUCTION-RELATED WATER QUALITY PERMITS (I.E. TDEC ARAP, US COE AND TVA SECTION 26a PERMITS) FOR CONSTRUCTION ACTIVITIES AROUND WATERS OF THE STATE. (10)

7.1.6. THE SWPPP WILL BE REVISED AS NECESSARY BASED ON THE RESULTS OF THE INSPECTION. REVISION(S) WILL BE RECORDED WITHIN 7 DAYS OF THE INSPECTION. REVISION(S) WILL BE IMPLEMENTED WITHIN 14 DAYS OF THE INSPECTION. (3.8.5.2.e AND 3.5.8.2.f)

7.1.7. THE INSPECTOR SHALL CONDUCT PRE-CONSTRUCTION INSPECTIONS TO VERIFY AREAS THAT ARE NOT TO BE DISTURBED HAVE BEEN MARKED IN THE SWPPP AND IN THE FIELD BEFORE LAND DISTURBANCE ACTIVITIES BEGIN AND INITIAL MEASURES HAVE BEEN INSTALLED. (10 "INSPECTOR") (3.5.1.n)

7.1.8. INSPECTIONS WILL BE DOCUMENTED ON THE CONSTRUCTION STORMWATER INSPECTION CERTIFICATION FORM PROVIDED, AND INCLUDE THE SCOPE OF THE INSPECTION, NAME(S), TITLE AND TN EPSC CERTIFICATION NUMBER OF PERSONNEL MAKING THE INSPECTION, THE DATE(S) OF THE INSPECTION, CURRENT APPROXIMATE DISTURBED ACREAGE AT TIME OF INSPECTION, CHECKLIST (NOC, SWPPP, RAIN GAGE, SITE CONTACT INFORMATION, ETC.) AND MAJOR OBSERVATIONS RELATING TO THE IMPLEMENTATION OF THE SWPPP. (3.5.8.2.g)

7.1.9. DOCUMENTATION OF INSPECTIONS WILL BE MAINTAINED ON SITE IN THE "DOCUMENTATION AND PERMITS' BINDER.

7.1.10. THESE INSPECTION REQUIREMENTS DO NOT APPLY TO DEFINABLE AREAS OF THE SITE THAT HAVE MET FINAL STABILIZATION REQUIREMENTS AND HAVE BEEN NOTED IN THE SWPPP.

7.1.11. TRAINED CERTIFIED INSPECTORS SHALL COMPLETE INSPECTION DOCUMENTATION TO THE BEST OF THEIR ABILITY. FALSIFYING INSPECTION RECORDS OR OTHER DOCUMENTATION OR FAILURE TO COMPLETE INSPECTION DOCUMENTATION SHALL RESULT IN A VIOLATION OF THIS PERMIT AND ANY OTHER APPLICABLE ACTS OR RULES. (3.8.5.2.h)

7.2. DULY AUTHORIZED REPRESENTATIVE (7.7.3)

THE PROJECT SUPERVISOR/CONTRACTOR MAY DELEGATE AN INDIVIDUAL AND/OR CONSULTANT TO SIGN EPSC INSPECTIONS REPORTS. FOR SATISFYING SIGNATORY REQUIREMENTS FOR EPSC INSPECTION REPORTS, THE PROJECT SUPERVISOR/CONTRACTOR AND NEWLY AUTHORIZED INDIVIDUAL ACCEPTING RESPONSIBILITY MUST SUBMIT WRITTEN AUTHORIZATION TO THE LOCAL TDEC EFO.

7.3. MAINTENANCE PRACTICES (3.5.3.1 AND 3.5.7)

7.3.1. ALL CONTROLS WILL BE MAINTAINED IN GOOD AND EFFECTIVE OPERATING ORDER. NECESSARY REPAIRS OR MAINTENANCE WILL BE ACCOMPLISHED BEFORE THE NEXT STORM EVENT AND IN NO CASE MORE THAN 7 DAYS AFTER THE NEED IS IDENTIFIED. IN A CASE WHERE THE ACTIVITY IS DEEMED IMPRACTIBLE, ANY SUCH CONDITIONS WILL BE DOCUMENTED (3.5.8.2.e).

7.3.2. ALL CONTROLS WILL BE MAINTAINED IN ACCORDANCE WITH STANDARD DRAWINGS AND GOOD ENGINEERING PRACTICES. (3.5.3.1.b)

7.3.3. SEDIMENT WILL BE REMOVED FROM SEDIMENT TRAPS, SILT FENCE, SEDIMENT BASINS, AND OTHER CONTROLS WHEN THE DESIGN CAPACITY HAS BEEN REDUCED BY 50%. (3.5.3.1.e)

7.3.4. CHECK DAMS WILL BE INSPECTED FOR STABILITY. SEDIMENT WILL BE REMOVED WHEN DEPTH REACHES ONE-HALF (½) THE HEIGHT OF THE DAM.

7.3.5. LITTER, CONSTRUCTION DEBRIS, AND CONSTRUCTION CHEMICALS EXPOSED TO STORMWATER WILL BE PICKED UP AND REMOVED FROM STORMWATER EXPOSURE PRIOR TO ANTICIPATED STORM EVENTS OR BEFORE BEING CARRIED OFF OF THE SITE BY WIND, OR OTHERWISE PREVENTED FROM BECOMING A POLLUTANT SOURCE FOR STORMWATER DISCHARGES. AFTER USE, MATERIALS USED FOR EROSION CONTROL WILL BE REMOVED. (3.5.3.1.f)

7.3.6. ALL SEEDED AREAS WILL BE CHECKED FOR BARE SPOTS, EROSION WASHOUTS, AND VIGOROUS GROWTH FREE OF SIGNIFICANT WEED INFESTATIONS.

4

**8. SITE ASSESSMENTS** (3.1.2)

QUALITY ASSURANCE SITE ASSESSMENTS OF EROSION PREVENTION AND SEDIMENT CONTROLS REQUIRED:

YES ☒ NO ☐

**9. STORMWATER MANAGEMENT** (3.5.4)

9.1 STORMWATER MANAGEMENT WILL BE HANDLED BY TEMPORARY CONTROLS OUTLINED IN THIS SWPPP, AND ANY PERMANENT CONTROLS NEEDED TO MEET PERMANENT STORMWATER MANAGEMENT NEEDS IN THE POST CONSTRUCTION PERIOD. PERMANENT CONTROLS WILL BE SHOWN ON THE PLANS AND NOTED AS PERMANENT.

9.2 DESCRIBE ANY SPECIFIC POST-CONSTRUCTION MEASURES THAT WILL CONTROL VELOCITY, POLLUTANTS, AND/OR EROSION (3.5.1.F, 3.5.4):

Post construction erosion control measures will not be required.

9.3 OTHER ITEMS NEEDING CONTROL (3.5.5)

9.3.1 CONSTRUCTION MATERIALS

THE FOLLOWING MATERIALS OR SUBSTANCES ARE EXPECTED TO BE PRESENT ON THE SITE DURING THE CONSTRUCTION PERIOD. (CHECK ALL THAT APPLY).

☐ LUMBER, GUARDRAIL, TRAFFIC CONTROL DEVICES

☒ CONCRETE WASHOUT

☐ CONCRETE AND CORRUGATED METAL PIPES

☒ MINERAL AGGREGATES, ASPHALT

☒ EARTH

☒ LIQUID TRAFFIC STRIPING MATERIALS, PAINT

☒ ROCK

☐ CURING COMPOUND

☐ EXPLOSIVES

☐ OTHER:

THESE MATERIALS WILL BE HANDLED AS NOTED IN THIS SWPPP.

9.3.2 WASTE MATERIALS (3.5.5.b)

WASTE MATERIAL (EARTH, ROCK, ASPHALT, CONCRETE, ETC.) NOT REQUIRED FOR THE CONSTRUCTION OF THE PROJECT WILL BE DISPOSED OF BY THE CONTRACTOR. THE CONTRACTOR WILL OBTAIN ANY AND ALL NECESSARY PERMITS INCLUDING, BUT NOT LIMITED TO NPDES, AQUATIC RESOURCES ALTERATION PERMIT(S) CORPS OF ENGINEERS SECTION 404 PERMITS, AND TVA SECTION 26A PERMITS TO DISPOSE OF WASTE MATERIALS.

9.3.3 HAZARDOUS WASTE (3.5.5.c) (7.9)

ALL HAZARDOUS WASTE MATERIALS WILL BE DISPOSED OF IN A MANNER WHICH IS COMPLIANT WITH LOCAL OR STATE REGULATIONS. SITE PERSONNEL WILL BE INSTRUCTED IN THESE PRACTICES, AND THE INDIVIDUAL DESIGNATED AS THE CONTRACTOR'S ON-SITE REPRESENTATIVE WILL BE RESPONSIBLE FOR SEEING THAT THESE PRACTICES ARE FOLLOWED. THE CONTRACTOR WILL OBTAIN ANY AND ALL NECESSARY PERMITS TO DISPOSE OF HAZARDOUS MATERIAL.

9.3.4 SANITARY WASTE (3.5.5.b)

PORTABLE SANITARY FACILITIES WILL BE PROVIDED ON ALL CONSTRUCTION SITES. SANITARY WASTE WILL BE COLLECTED FROM THE PORTABLE UNITS IN A TIMELY MANNER BY A LICENSED WASTE MANAGEMENT CONTRACTOR OR AS REQUIRED BY ANY LOCAL REGULATIONS. THE CONTRACTOR WILL OBTAIN ANY AND ALL NECESSARY PERMITS TO DISPOSE OF SANITARY WASTE.

9.3.5 OTHER MATERIALS

THE FOLLOWING MATERIALS OR SUBSTANCES ARE EXPECTED TO BE PRESENT ON THE SITE DURING THE CONSTRUCTION PERIOD. (CHECK ALL THAT APPLY).

☒ FERTILIZERS AND LIME

☐ PESTICIDES AND/OR HERBICIDES

☒ DIESEL AND GASOLINE

☒ MACHINERY LUBRICANTS (OIL AND GREASE)

THESE MATERIALS WILL BE HANDLED AS NOTED THIS SWPPP.

**10. NON-STORMWATER DISCHARGES** (3.5.9)

10.1. THE FOLLOWING NON-STORMWATER DISCHARGES ARE ANTICIPATED DURING THE COURSE OF THIS PROJECT (CHECK ALL THAT APPLY):

10.1.1. ☐ DEWATERING OF WORK AREAS OF COLLECTED STORMWATER AND GROUND WATER

5

10.1.2. ☐ WATERS USED TO WASH VEHICLES (OF DUST AND SOIL)    WHERE DETERGENTS ARE NOT USED AND DETENTION AND/OR FILTERING IS  PROVIDED BEFORE THE WATER LEAVES SITE

10.1.3. ☐ WATER USED TO CONTROL DUST (3.5.3.1.n)

10.1.4. ☐ POTABLE WATER SOURCES INCLUDING WATERLINE FLUSHINGS FROM WHICH CHLORINE HAS BEEN REMOVED TO THE MAXIMUM EXTENT PRACTICABLE

10.1.5. ☐ UNCONTAMINATED GROUNDWATER OR SPRING WATER

10.1.6. ☐ FOUNDATION OR FOOTING DRAINS WHERE FLOWS ARE NOT CONTAMINATED WITH POLLUTANTS

10.1.7. ☐ OTHER:

10.2. ALL ALLOWABLE NON-STORMWATER DISCHARGES WILL BE DIRECTED TO STABLE DISCHARGE STRUCTURES PRIOR TO LEAVING THE SITE. FILTERING OR CHEMICAL TREATMENT MAY BE NECESSARY PRIOR TO DISCHARGE.

10.3. THE DESIGN OF ALL IMPACTED EPSC MEASURES RECEIVING FLOW FROM ALLOWABLE NON-STORMWATER DISCHARGES MUST BE DESIGNED TO HANDLE THE VOLUME OF THE NON-STORMWATER COMPONENT.

10.4. WASH DOWN OR WASTE DISCHARGE OF CONCRETE TRUCKS WILL NOT BE PERMITTED ON-SITE UNLESS PROPER SETTLEMENT AREAS HAVE BEEN PROVIDED IN ACCORDANCE WITH BOTH STATE AND FEDERAL REGULATIONS.

10.5. ARE ANY DISCHARGES ASSOCIATED WITH INDUSTRIAL (NON-CONSTRUCTION STORMWATER) ACTIVITY EXPECTED (3.5.1.h)?
YES ☐ NO ☒  IF YES, SPECIFY THE LOCATION OF THE ACTIVITY AND ITS PERMIT NUMBER.

## 11. SPILL PREVENTION, MANAGEMENT AND NOTIFICATION (3.5.5.c, 5.1)

11.1. SPILL PREVENTION (3.5.5.c)

11.1.1. MATERIAL MANAGEMENT

11.1.1.1. HOUSEKEEPING

ONLY PRODUCTS NEEDED WILL BE STORED ON-SITE BY THE CONTRACTOR.  EXCEPT FOR BULK MATERIALS THE CONTRACTOR WILL STORE ALL MATERIALS UNDER COVER AND IN APPROPRIATE CONTAINERS. PRODUCTS MUST BE STORED IN ORIGINAL CONTAINERS AND LABELED.  MATERIAL MIXING WILL BE CONDUCTED IN ACCORDANCE WITH THE MANUFACTURER'S RECOMMENDATIONS. WHEN POSSIBLE, ALL PRODUCTS WILL BE USED COMPLETELY BEFORE PROPERLY DISPOSING OF THE CONTAINER OFF SITE. THE MANUFACTURER'S DIRECTIONS FOR DISPOSAL OF MATERIALS AND CONTAINERS WILL BE FOLLOWED. THE CONTRACTOR'S SITE SUPERINTENDENT WILL INSPECT MATERIALS STORAGE AREAS REGULARLY TO ENSURE PROPER USE AND DISPOSAL.  DUST GENERATED WILL BE CONTROLLED IN AN ENVIRONMENTALLY SAFE MANNER.  VEGETATION AREAS NOT ESSENTIAL TO THE CONSTRUCTION PROJECT WILL BE PRESERVED AND MAINTAINED AS NOTED ON THE PLANS.

11.1.1.2. HAZARDOUS MATERIALS

PRODUCTS WILL BE KEPT IN ORIGINAL CONTAINERS UNLESS THE CONTAINER IS NOT RESEALABLE.  ORIGINAL LABELS AND MATERIAL SAFETY DATA SHEETS WILL BE RETAINED IN A SAFE PLACE TO RELAY IMPORTANT PRODUCT INFORMATION.  IF SURPLUS PRODUCT MUST BE DISPOSED OF, MANUFACTURER'S LABEL DIRECTIONS FOR DISPOSAL WILL BE FOLLOWED. MAINTENANCE AND REPAIR OF ALL EQUIPMENT AND VEHICLES INVOLVING OIL CHANGES, HYDRAULIC SYSTEM DRAIN DOWN, DE-GREASING OPERATIONS, FUEL TANK DRAIN DOWN AND REMOVAL, AND OTHER ACTIVITIES WHICH MAY RESULT IN THE ACCIDENTAL

RELEASE OF CONTAMINANTS WILL BE CONDUCTED ON AN IMPERVIOUS SURFACE AND UNDER COVER DURING WET WEATHER TO PREVENT THE RELEASE OF CONTAMINANTS ONTO THE GROUND.  WHEEL WASH WATER WILL BE COLLECTED AND ALLOWED TO SETTLE OUT SUSPENDED SOLIDS PRIOR TO DISCHARGE. WHEEL WASH WATER WILL NOT BE DISCHARGED DIRECTLY INTO ANY STORMWATER SYSTEM OR STORMWATER TREATMENT SYSTEM. POTENTIAL PH-MODIFYING MATERIALS SUCH AS:  BULK CEMENT, CEMENT KILN DUST, FLY ASH, NEW CONCRETE WASHINGS AND CURING WATERS, CONCRETE PUMPING, AND MIXER WASHOUT WATERS WILL BE COLLECTED ON SITE AND MANAGED TO PREVENT CONTAMINATION OF STORMWATER RUNOFF.

11.1.1.3    PRODUCT SPECIFIC PRACTICES

11.1.1.3.1 PETROLEUM PRODUCTS: ALL ON-SITE VEHICLES WILL BE MONITORED FOR LEAKS AND RECEIVE REGULAR PREVENTIVE MAINTENANCE TO REDUCE THE CHANCE OF LEAKAGE. PETROLEUM PRODUCTS WILL BE STORED IN TIGHTLY SEALED CONTAINERS WHICH ARE CLEARLY LABELED.

11.1.1.3.2 FERTILIZERS: FERTILIZERS WILL BE APPLIED ONLY IN THE AMOUNTS SPECIFIED BY THE MANUFACTURER. ONCE APPLIED, FERTILIZERS WILL BE WORKED INTO THE SOIL TO LIMIT THE EXPOSURE TO STORMWATER. FERTILIZERS WILL BE STORED IN AN ENCLOSED AREA UNDER COVER. THE CONTENTS OF PARTIALLY USED FERTILIZER BAGS WILL BE TRANSFERRED TO SEALABLE CONTAINERS TO AVOID SPILLS.

11.1.1.3.3 PAINTS: ALL CONTAINERS WILL BE TIGHTLY SEALED AND STORED WHEN NOT REQUIRED FOR USE.  THE EXCESS WILL BE DISPOSED OF ACCORDING TO THE MANUFACTURER'S INSTRUCTIONS AND APPLICABLE STATE AND LOCAL REGULATIONS.

11.1.1.3.4 CONCRETE TRUCKS: CONTRACTORS WILL PROVIDE DESIGNATED TRUCK WASHOUT AREAS ON THE SITE. THESE AREAS MUST BE SELF CONTAINED AND NOT CONNECTED TO ANY STORMWATER OUTLET OF THE SITE. UPON COMPLETION OF CONSTRUCTION WASHOUT AREAS WILL BE PROPERLY STABILIZED.

11.2. SPILL MANAGEMENT

11.2.1. IN ADDITION TO THE PREVIOUS HOUSEKEEPING AND MANAGEMENT PRACTICES, THE FOLLOWING PRACTICES WILL BE FOLLOWED FOR SPILL PREVENTION AND CLEANUP IF NECESSARY.

11.2.2. FOR ALL HAZARDOUS MATERIALS STORED ON SITE, THE MANUFACTURER'S RECOMMENDED METHODS FOR SPILL CLEAN UP WILL BE CLEARLY POSTED.  SITE PERSONNEL WILL BE MADE AWARE OF THE PROCEDURES AND THE LOCATIONS OF THE INFORMATION AND CLEANUP SUPPLIES.

11.2.3. APPROPRIATE CLEANUP MATERIALS AND EQUIPMENT WILL BE MAINTAINED BY THE CONTRACTOR IN THE MATERIALS STORAGE AREA ON-SITE AND UNDER COVER.  AS APPROPRIATE, EQUIPMENT AND MATERIALS MAY INCLUDE ITEMS SUCH AS BOOMS, DUST PANS, MOPS, RAGS, GLOVES, GOGGLES, KITTY LITTER, SAND, SAWDUST, AND PLASTIC AND METAL TRASH CONTAINERS SPECIFICALLY FOR CLEAN UP PURPOSES.

6

11.2.4. ALL SPILLS WILL BE CLEANED IMMEDIATELY AFTER DISCOVERY AND THE MATERIALS DISPOSED OF PROPERLY. THE SPILL AREA WILL BE KEPT WELL VENTILATED AND PERSONNEL WILL WEAR APPROPRIATE PROTECTIVE CLOTHING TO PREVENT INJURY FROM CONTACT WITH A HAZARDOUS SUBSTANCE.

11.2.5. THE CONTRACTOR'S SITE SUPERINTENDENT WILL BE THE SPILL PREVENTION AND CLEANUP COORDINATOR. THE CONTRACTOR IS RESPONSIBLE FOR ENSURING THAT THE SITE SUPERINTENDENT HAS HAD APPROPRIATE TRAINING FOR HAZARDOUS MATERIALS HANDLING, SPILL MANAGEMENT, AND CLEANUP.

11.2.6. IF SPILLS REPRESENT AN IMMINENT THREAT OF ESCAPING THE SITE AND ENTERING RECEIVING WATERS, PERSONNEL WILL RESPOND IMMEDIATELY TO CONTAIN THE RELEASE AND NOTIFY THE SUPERINTENDENT AFTER THE SITUATION HAS BEEN STABILIZED.

11.2.7. IF OIL SHEEN IS OBSERVED ON SURFACE WATER (E.G. SETTLING PONDS, DETENTION PONDS, SWALES), ACTION WILL BE TAKEN IMMEDIATELY TO REMOVE THE MATERIAL CAUSING THE SHEEN. THE CONTRACTOR WILL USE APPROPRIATE MATERIALS TO CONTAIN AND ABSORB THE SPILL. THE SOURCE OF THE OIL SHEEN WILL ALSO BE IDENTIFIED AND REMOVED OR REPAIRED AS NECESSARY TO PREVENT FURTHER RELEASES.

11.2.8. IF A SPILL OCCURS THE CONTRACTOR WILL BE RESPONSIBLE FOR COMPLETING THE SPILL REPORTING FORM.

11.2.9. SPILL RESPONSE EQUIPMENT WILL BE INSPECTED AND MAINTAINED BY THE CONTRACTOR AS NECESSARY TO REPLACE ANY MATERIALS USED IN SPILL RESPONSE ACTIVITIES.

11.3 SPILL NOTIFICATION (5.1)

11.3.1 ALL FUELING OF EQUIPMENT AND VEHICLES ON SITE WILL BE CONDUCTED NEAR THE CONSTRUCTION ENTRANCE/STAGING AREA ON THE EAST SIDE OF THIS SITE. ANY SPILLAGE WILL BE REMOVED IMMEDIATELY. CONTAMINATED SOILS WILL BE PLACED ON HEAVY PLASTIC AND COVERED OR PLACED INTO APPROVED CONTAINERS TO PREVENT CONTACT WITH STORM WATER. ALL FUEL TANKS WILL BE IN THE CONTAINMENT AREA. OILS, OTHER VEHICLE FLUIDS, PAINTS, AND SOLVENTS WILL BE STORED IN THE CONSTRUCTION TRAILER. ANY SPILL IN EXCESS OF TWO GALLONS WILL BE REPORTED TO THE CONTRACTOR.

11.3.2 IF A RELEASE CONTAINING HAZARDOUS SUBSTANCE IN AN AMOUNT EQUAL TO OR IN EXCESS OF A REPORTING QUANTITY ESTABLISHED UNDER EITHER 40 CFR117 OR 40 CFR302 OCCURS DURING A 24-HOUR PERIOD, THE CONTRACTOR WILL IMMEDIATELY NOTIFY THE PERMITTEE WHO SHALL THEN DO THE FOLLOWING: NOTIFY THE NATIONAL RESPONSE CENTER (NRC) (800-424-8802) AND THE TENNESSEE EMERGENCY MANAGEMENT AGENCY (TEMA) (EMERGENCIES: 800-262-3300; NON-EMERGENCIES: 800-262-3400); AS WELL AS THE LOCAL ENVIRONMENTAL ASSISTANCE CENTER.

11.3.3 CONCRETE TRUCKS WILL WASH OUT AT A DESIGNATED AREA NEAR THE CONSTRUCTION ENTRANCE. EACH CONTRACTOR IS RESPONSIBLE TO PROVIDE LITTER CONTROL FOR TRASH GENERATED BY HIS CREW. A DUMPSTER FOR GARBAGE WILL BE LOCATED NEAR THE CONSTRUCTION TRAILER AND IS LIMITED TO GARBAGE AND PAPER TRASH ONLY. PAINT CANS, OIL CANS, USED OIL, AND FILTERS WILL BE CONTAINED AND DISPOSED OF BY THE CONTRACTOR BY TAKING THEM TO AN APPROVED HAZARDOUS WASTE DISPOSAL CENTER.

11.4 WHERE A RELEASE CONTAINING A HAZARDOUS SUBSTANCE IN AN AMOUNT EQUAL TO OR IN EXCESS OF A REPORTABLE QUANTITY ESTABLISHED UNDER EITHER 40 CFR 117 OR 40 CFR 302 OCCURS DURING A 24 HOUR PERIOD:

11.4.1 A WRITTEN DESCRIPTION OF THE RELEASE, DATE OF RELEASE AND

11.4.2 CIRCUMSTANCES LEADING TO THE RELEASE, WHAT ACTIONS WERE TAKEN TO MITIGATE EFFECTS OF THE RELEASE, AND STEPS TAKEN TO MINIMIZE THE CHANCE OF FUTURE OCCURRENCES WILL BE SUBMITTED TO THE APPROPRIATE TDEC ENVIRONMENTAL FIELD OFFICE WITHIN 14 DAYS OF KNOWLEDGE OF THE RELEASE.

11.4.3 THE SWPPP MUST BE MODIFIED WITHIN 14 DAYS OF KNOWLEDGE OF THE RELEASE PROVIDING A DESCRIPTION OF THE RELEASE, CIRCUMSTANCES LEADING TO THE RELEASE, AND THE DATE OF RELEASE. THE SWPPP WILL BE REVIEWED AND MODIFIED AS NECESSARY TO IDENTIFY MEASURES TO PREVENT THE REOCCURRENCE OF SUCH RELEASES AND TO RESPOND TO SUCH RELEASES.

## 12. RECORD KEEPING

12.1. REQUIRED RECORDS

CONTRACTOR OR THEIR DESIGNEE WILL MAINTAIN AT THE SITE THE FOLLOWING RECORDS OF CONSTRUCTION ACTIVITIES (3.5.3.1.m) (6.2.1):

12.1.1. THE DATES WHEN MAJOR GRADING ACTIVITIES OCCUR

12.1.2. THE DATES WHEN CONSTRUCTION ACTIVITIES TEMPORARILY OR PERMANENTLY CEASE ON A PORTION OF THE SITE

12.1.3. THE DATES WHEN STABILIZATION MEASURES ARE INITIATED

12.1.4. RECORDS OF TWICE WEEKLY EPSC INSPECTION REPORTS AND CORRECTIVE MEASURES

12.1.5. COPY OF SITE EPSC INSPECTOR'S TDEC LEVEL 1 CERTIFICATION

12.1.6. RAINFALL MONITORING PLAN (3.5.3.1.o)

12.1.6.1 EQUIPMENT

AT A MINIMUM, THE CONTRACTOR WILL INSTALL A FENCE POST TYPE RAIN GAUGE TO MEASURE RAINFALL. THE STANDARD FENCE POST RAIN GAUGE WILL BE A WEDGE-SHAPED GAUGE THAT MEASURES UP TO 6 INCHES OF RAINFALL. AN ENGLISH SCALE WILL BE PROVIDED ON ONE FACE, WITH A METRIC SCALE ON THE OTHER FACE. GRADUATION WILL BE PERMANENTLY MOLDED IN DURABLE WEATHER-RESISTANT PLASTIC. THE MINIMUM GRADUATION WILL BE 0.01 INCH (OR 0.1MM). AN ALUMINUM BRACKET WITH SCREWS MAY BE USED TO MOUNT THE GAUGE ON A WOODEN SUPPORT. IN LIEU OF INSTALLING A RAIN GAUGE AT THE PROJECT SITE A REFERENCE GUAGE FROM A RECOGNIZED SOURCE SUCH AS NOAA WITHIN THE PROXIMITY OF THE PROJECT MAY BE UTILIZED.

12.1.6.2 LOCATION

THE RAIN GAUGE WILL BE LOCATED AT OR ALONG THE PROJECT SITE, AS DEFINED IN THE NOI OF THE NPDES PERMIT, IN AN OPEN AREA SUCH THAT THE MEASUREMENT WILL NOT BE INFLUENCED BY OUTSIDE FACTORS (I.E. OVERHANGS, GUTTER, TREES, ETC). AT LEAST ONE RAIN GAUGE PER LINEAR MILE IS REQUIRED ALONG (AS MEASURED ALONG THE CENTERLINE OF THE PRIMARY ALIGNMENT) THE PROJECT WHERE CLEARING, GRUBBING, EXCAVATION, GRADING, CUTTING OR FILLING IS ACTIVELY PERFORMED, OR EXPOSED SOIL HAS NOT YET BEEN PERMANENTLY STABILIZED.

12.1.6.3 METHODS

7

12.1.6.3.1. RAINFALL MONITORING WILL BE INITIATED PRIOR TO CLEARING, GRUBBING, EXCAVATION, GRADING, CUTTING, OR FILLING, EXCEPT AS SUCH MINIMAL CLEARING MAY BE NECESSARY TO INSTALL A RAIN GAUGE IN AN OPEN AREA. THE RAIN GAUGE WILL BE CHECKED FOR OPERATIONAL SOUNDNESS DAILY (DURING NORMAL BUSINESS HOURS) IN WET TIMES AND WEEKLY IN DRY TIMES. GAUGES WILL BE REPAIRED OR REPLACED ON THE SAME DAY IF FOUND TO BE NON-OPERATIONAL OR MISSING.

12.1.6.3.2 EACH RAIN GAUGE WILL BE READ (FOR DETAILED RECORDS OF RAINFALL) AND EMPTIED AFTER EVERY RAINFALL EVENT OCCURRING ON THE PROJECT SITE AT APPROXIMATELY THE SAME TIME OF THE DAY (DURING NORMAL BUSINESS HOURS). DURING PERIODS OF DRY CONDITIONS, IT WILL NOT BE NECESSARY TO READ THE RAIN GAUGE EVERY DAY. IN LIEU OF THIS REQUIREMENT ON WEEKENDS AND ON STATE HOLIDAYS, THE RAIN GAUGES CAN BE EMPTIED THE NEXT BUSINESS DAY AND A REFERENCE SITE USED FOR A RECORD OF DAILY AMOUNT OF PRECIPITATION FOR THOSE DAYS. A REFERENCE SITE IS THE DOCUMENTATION FROM THE CLOSEST GAUGE WITHIN PROXIMITY OF THE PROJECT FROM A RECOGNIZED SOURCE SUCH AS THE NOAA NATIONAL WEATHER SERVICE.

12.1.6.3.3 DETAILED RECORDS WILL BE RECORDED OF RAINFALL EVENTS INCLUDE DATES, AMOUNTS OF RAINFALL, AND THE APPROXIMATE DURATION (OR THE STARTING AND ENDING TIMES).

12.1.6.3.4 IF, IN THE EVENT THAT THE RAINFALL EVENT IS STILL IN PROGRESS AT THE DAILY RECORDING TIME, THE GAUGE WILL BE EMPTIED AND THE RECORD WILL INDICATE THAT THE STORM EVENT WAS STILL IN PROGRESS.

12.1.6.3.5 RAIN GAUGE INFORMATION (DETAILED RECORDS), INCLUDING THE LOCATION OF THE NEAREST OUTFALL, WILL BE RECORDED ON THE EPSC INSPECTION REPORT FORMS AT THE TIME OF MEASUREMENT.

12.2 KEEPING PLANS CURRENT (3.4)

CONTRACTOR OR THEIR DESIGNEE WILL MODIFY AND UPDATE THE SWPPP WHEN ANY OF THE FOLLOWING CONDITIONS APPLY:

12.2.1 WHENEVER THERE IS A CHANGE IN THE SCOPE OF THE PROJECT THAT WOULD BE EXPECTED TO HAVE A SIGNIFICANT EFFECT ON THE DISCHARGE OF POLLUTANTS TO THE WATERS OF THE STATE AND WHICH HAS NOT OTHERWISE BEEN ADDRESSED IN THE SWPPP;

12.2.2 WHENEVER INSPECTIONS OR INVESTIGATIONS BY SITE OPERATORS, LOCAL, STATE, OR FEDERAL OFFICIALS INDICATE THE SWPPP IS PROVING INEFFECTIVE IN ELIMINATING OR SIGNIFICANTLY MINIMIZING POLLUTANTS FROM CONSTRUCTION ACTIVITY SOURCES, OR IS OTHERWISE NOT ACHIEVING THE GENERAL OBJECTIVES OF CONTROLLING POLLUTANTS IN STORMWATER DISCHARGES ASSOCIATED WITH CONSTRUCTION ACTIVITY; WHERE LOCAL, STATE, OR FEDERAL OFFICIALS DETERMINE THAT THE SWPPP IS INEFFECTIVE IN ELIMINATING OR SIGNIFICANTLY MINIMIZING POLLUTANT SOURCES, A COPY OF ANY CORRESPONDENCE TO THAT EFFECT MUST BE RETAINED IN THE SWPPP;

12.2.3 WHEN ANY NEW OPERATOR AND/OR SUB-OPERATOR IS ASSIGNED OR RELIEVED OF THEIR RESPONSIBILITY TO IMPLEMENT A PORTION OF THE SWPPP;

12.2.4 TO PREVENT A NEGATIVE IMPACT TO LEGALLY PROTECTED STATE OR FEDERALLY LISTED OR PROPOSED THREATENED OR ENDANGERED AQUATIC FAUNA;

12.2.5 WHEN THERE IS A CHANGE IN CHEMICAL TREATMENT METHODS INCLUDING: USE OF DIFFERENT TREATMENT CHEMICALS, DIFFERENT DOSAGE OR APPLICATION RATES OR A DIFFERENT AREA OF APPLICATION NOT SPECIFIED ON THE EPSC PLANS; OR

12.2.6 WHEN A TMDL IS DEVELOPED FOR THE RECEIVING WATERS FOR A POLLUTANT OF CONCERN (SILTATION AND/OR HABITAT ALTERATION)

12.3 MAKING PLANS ACCESSIBLE

12.3.1 CONTRACTOR WILL RETAIN A COPY OF THIS SWPPP (INCLUDING A COPY OF THE "DOCUMENTATION AND PERMITS" BINDER AT THE CONSTRUCTION SITE (OR OTHER LOCATION ACCESSIBLE TO TDEC AND THE PUBLIC) FROM THE DATE CONSTRUCTION COMMENCES TO THE DATE OF FINAL STABILIZATION. CONTRACTOR WILL HAVE A COPY OF THE

12.3.2 SWPPP AVAILABLE AT THE LOCATION WHERE WORK IS OCCURRING ON-SITE FOR THE USE OF OPERATORS AND THOSE IDENTIFIED AS HAVING RESPONSIBILITIES UNDER THE SWPPP WHENEVER THEY ARE ON THE CONSTRUCTION SITE. (6.2)

12.3.3 PRIOR TO THE INITIATION OF LAND DISTURBING ACTIVITIES AND UNTIL THE SITE HAS MET THE FINAL STABILIZATION CRITERIA, CONTRACTOR OR THEIR DESIGNEE WILL POST A NOTICE NEAR THE MAIN ENTRANCE OF THE CONSTRUCTION SITE WITH THE FOLLOWING INFORMATION (3.3.3) (6.2.1):

12.3.3.1. A COPY OF THE NOTICE OF COVERAGE (NOC) WITH THE NPDES PERMIT NUMBER FOR THE PROJECT;

12.3.3.2. THE INDIVIDUAL NAME, COMPANY NAME, E-MAIL ADDRESS (IF APPLICABLE) AND TELEPHONE NUMBER OF THE LOCAL PROJECT SITE OWNER AND OPERATOR CONTACT;

12.3.3.3. A BRIEF DESCRIPTION OF THE PROJECT; AND

12.3.3.4. THE LOCATION OF THE SWPPP.

12.3.4 ALL INFORMATION DESCRIBED IN SECTION 12.3.3 MUST BE MAINTAINED IN LEGIBLE CONDITION. IF POSTING THIS INFORMATION NEAR A MAIN ENTRANCE IS INFEASIBLE DUE TO SAFETY CONCERNS, THE NOTICE SHALL BE POSTED IN A LOCAL BUILDING. THE NOTICE MUST BE PLACED IN A PUBLICLY ACCESSIBLE LOCATION WHERE CONSTRUCTION IS ACTIVELY UNDERWAY AND MOVED AS NECESSARY.

12.4. NOTICE OF TERMINATION (8.)

12.4.1. WHEN ALL STORMWATER DISCHARGES FROM CONSTRUCTION ACTIVITIES THAT ARE AUTHORIZED BY THE PERMIT ARE ELIMINATED BY FINAL STABILIZATION, CONTRACTOR WILL SUBMIT A NOTICE OF TERMINATION (NOT) THAT IS SIGNED IN ACCORDANCE WITH THE PERMIT TO THE TDEC COLUMBIA ENVIRONMENTAL FIELD OFFICE.

12.4.2. FOR THE PURPOSES OF THE CERTIFICATION REQUIRED BY THE NOT, THE ELIMINATION OF STORMWATER DISCHARGES ASSOCIATED WITH THE CONSTRUCTION ACTIVITY MEANS THE FOLLOWING:

12.4.2.1. ALL EARTH-DISTURBING ACTIVITIES ON THE SITE ARE COMPLETED AND ALL DISTURBED SOILS AT THE PORTION OF THE CONSTRUCTION SITE WHERE THE OPERATOR HAD CONTROL HAVE BEEN FINALLY STABILIZED; AND

12.4.2.2. ALL CONSTRUCTION MATERIALS, WASTE AND WASTE HANDLING DEVICES, AND ALL EQUIPMENT, AND VEHICLES THAT WERE USED DURING CONSTRUCTION HAVE BEEN REMOVED AND PROPERLY DISPOSED; AND

12.4.2.3. ALL STORMWATER CONTROLS THAT WERE INSTALLED AND MAINTAINED DURING CONSTRUCTION, EXCEPT THOSE THAT ARE INTENDED FOR LONG-TERM USE FOLLOWING TERMINATION OF PERMIT COVERAGE, HAVE BEEN REMOVED; AND

12.4.2.4. ALL POTENTIAL POLLUTANTS AND POLLUTANT GENERATING ACTIVITIES ASSOCIATED WITH CONSTRUCTION HAVE BEEN REMOVED; AND

12.4.2.5. THE PERMITTEE HAS IDENTIFIED WHO IS RESPONSIBLE FOR ONGOING MAINTENANCE OF ANY STORMWATER CONTROLS LEFT ON THE SITE FOR LONG-TERM USE FOLLOWING TERMINATION OF PERMIT COVERAGE; AND

12.4.2.6. TEMPORARY EPSC MEASURES HAVE BEEN OR WILL BE REMOVED AT AN APPROPRIATE TIME TO ENSURE FINAL STABILIZATION IS MAINTAINED; AND

12.4.2.7. ALL STORMWATER DISCHARGES ASSOCIATED WITH CONSTRUCTION ACTIVITIES FROM THE IDENTIFIED SITE THAT ARE AUTHORIZED BY A NPDES GENERAL PERMIT HAVE OTHERWISE BEEN ELIMINATED FROM THE PORTION OF THE CONSTRUCTION SITE WHERE THE OPERATOR HAD CONTROL.

12.5. RETENTION OF RECORDS (6.2)

THE PERMITTEE WILL RETAIN COPIES OF THE SWPPP, ALL REPORTS REQUIRED BY THE PERMIT, AND RECORDS OF ALL DATA USED TO COMPLETE THE NOTICE OF INTENT FOR THE PROJECT FOR A PERIOD OF AT LEAST THREE (3) YEARS FROM THE DATE THE NOI WAS FILED

13. **SITE WIDE/PRIMARY PERMITTEE CERTIFICATION** (7.7.6)

I CERTIFY UNDER PENALTY OF LAW THAT THIS DOCUMENT AND ALL ATTACHMENTS WERE PREPARED UNDER MY DIRECTION OR SUPERVISION IN ACCORDANCE WITH A SYSTEM DESIGNED TO ASSURE THAT QUALIFIED PERSONNEL PROPERLY GATHER AND EVALUATE THE INFORMATION SUBMITTED. BASED ON MY INQUIRY OF THE PERSON OR PERSONS WHO MANAGE THE SYSTEM, OR THOSE PERSONS DIRECTLY RESPONSIBLE FOR GATHERING THE INFORMATION, THE INFORMATION SUBMITTED IS, TO THE BEST OF MY KNOWLEDGE AND BELIEF, TRUE, ACCURATE, AND COMPLETE. I AM AWARE THAT THERE ARE SIGNIFICANT PENALTIES FOR SUBMITTING FALSE INFORMATION, INCLUDING THE POSSIBILITY OF FINE AND IMPRISONMENT FOR KNOWING VIOLATIONS.

AUTHORIZED PERSONNEL SIGNATURE (3.3.1)

_John Wear_
PRINTED NAME

_General Contractor_
TITLE

_6-17-2020_
DATE

14. **SECONDARY PERMITTEE (OPERATOR) CERTIFICATION** (7.7.6)

I CERTIFY UNDER PENALTY OF LAW THAT I HAVE REVIEWED THIS DOCUMENT, ANY ATTACHMENTS, AND THE SWPPP REFERENCED ABOVE BASED ON MY INQUIRY OF THE CONSTRUCTION SITE OWNER/DEVELOPER IDENTIFIED ABOVE AND/OR MY INQUIRY OF THE PERSON DIRECTLY RESPONSIBLE FOR ASSEMBLING THIS NOI AND SWPPP. I BELIEVE THE INFORMATION SUBMITTED IS ACCURATE. I AM AWARE THAT THIS NOI, IF APPROVED, MAKES THE ABOVE-DESCRIBED CONSTRUCTION ACTIVITY SUBJECT TO NPDES PERMIT NUMBER TNR100009, AND THAT CERTAIN OF MY ACTIVITIES ON-SITE ARE THEREBY REGULATED. I AM AWARE THAT THERE ARE SIGNIFICANT PENALTIES INCLUDING THE POSSIBILITY OF FINE AND IMPRISONMENT FOR KNOWING VIOLATIONS, AND FOR FAILURE TO COMPLY WITH THESE PERMIT REQUIREMENTS

AUTHORIZED OPERATOR (CONTRACTOR) SIGNATURE (3.3.1)

PRINTED NAME

TITLE

**Notice of Intent (NOI) for General NPDES Permit for Stormwater Discharges from Construction Activities (TNR100000)**

| Site or Project Name: Appalachian Springs Trout Farm & Campground Ph. II | NPDES Tracking Number: TNR | |
|---|---|---|
| Street Address or Location: 370 Ogle Dr., Pigeon Forge, TN 37863 | Construction Start Date: 11/1/2019 | |
| | Estimated End Date: 6/30/2020 | |
| Site Description: Trout Farm, Store, and Campground with associated parking. | Latitude (dd.dddd): 35.783618 | |
| | Longitude (-dd.dddd): -83.559608 | |
| County(ies): Sevier | MS4 (if applicable): | Acres Disturbed: 6.5 |

Check box if a SWPPP is attached : ☑  Check box if a site location map is attached: ☑  Total Acres: 11.83

Check the appropriate box(s) if there are streams and/or wetlands on or adjacent to the construction site:  Streams ☑  Wetlands ☐

Has a jurisdictional determination been made by the USACE or EPA identifying waters of the United States?  Yes ☐  No ☑
Note: if yes, attach the jurisdictional determination

If an Aquatic Resource Alteration Permit (ARAP) has been obtained for this site, what is the permit number? NR(S)

Receiving waters: Mill Creek

*Site Owner/Developer (Primary Permittee):* (Provide person, company, or entity that has operational or design control over construction plans and specifications):  Signature Development, LLC

For corporate entities only, provide correct Tennessee Secretary of State (SOS) Control Number: (an incorrect SOS control number may delay NOI processing)

| Site Owner or Developer Contact Name: (signs the certification below) John Wear | Title or Position: Owner | | |
|---|---|---|---|
| Mailing Address: PO Box 1188 | City: Pigeon Forge | State: TN | Zip: 37868 |
| Phone: ( 865 ) 755-1048    Fax: ( ) | E-mail: jwear1658@gmail.com | | |
| Optional Contact: | Title or Position: | | |
| Mailing Address: | City: | State: | Zip: |
| Phone: ( )    Fax: ( ) | E-mail: | | |

*Owner/Developer(s) Certification:* (must be signed by president, vice-president or equivalent, or ranking elected official) (Primary Permittee)

I certify under penalty of law that this document and all attachments were prepared by me, or under my direction or supervision. The submitted information is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment. As specified in Tennessee Code Annotated Section 39-16-702(a)(4), this declaration is made under penalty of perjury.

| Owner/Developer Name (print/type): John Wear | Signature: | Date: 6-17-2020 |
|---|---|---|
| Owner/Developer Name (print/type): | Signature: | Date: |

*Contractor Certification:* (must be signed by president, vice-president or equivalent, or ranking elected official) (Secondary Permittee)

I certify under penalty of law that I have reviewed this document, any attachments, and the SWPPP referenced above. Based on my inquiry of the construction site owner/developer identified above and/or my inquiry of the person directly responsible for assembling this NOI and SWPPP, I believe the information submitted is accurate. I am aware that this NOI, if approved, makes the above-described construction activity subject to NPDES permit number TNR100000, and that certain of my activities on-site are thereby regulated. I am aware that there are significant penalties, including the possibility of fine and imprisonment for knowing violations, and for failure to comply with these permit requirements. As specified in Tennessee Code Annotated Section 39-16- 702(a)(4), this declaration is made under penalty of perjury.

| Contractor name, address, and SOS control number (if applicable): | Signature: | Date: |
|---|---|---|
| | | |

OFFICIAL STATE USE ONLY

| Received Date: | Reviewer | Field Office | Permit Tracking Number: TNR | Exceptional TN Water: |
|---|---|---|---|---|
| Fee(s): | T & E Aquatic Flora/Fauna: | SOS Corporate Status: | Waters with Unavailable Parameters: | Notice of Coverage Date: |

# CONSTRUCTION GENERAL PERMIT - NOTICE OF INTENT (NOI) - INSTRUCTIONS

A completed NOI must be submitted to obtain coverage under the CGP. **Requesting coverage under this permit means that an applicant has obtained and examined a copy of this permit, and thereby acknowledges applicant's claim of ability to be in compliance with permit terms and conditions.** CGP coverage is required for stormwater (SW) discharge(s) from construction activities including clearing, grading, filling and excavating (including borrow pits) of one or more acres of land. This form should be submitted at least 30 days prior to the commencement of land disturbing activities, or no later than 48 hours prior to when a new operator assumes operational control over site specifications or commences work at the site.

The application fee must accompany the NOI and is based on total acreage to be disturbed by an entire project, including any associated construction support activities (e.g., equipment staging yards, material storage areas, excavated material disposal areas, borrow or waste sites, etc.). A separate annual maintenance fee is also required for activities that exceed 1 year under CGP coverage. See TN Rules, Chapter 0400-40-11-.02(b)(12).

| Acres Disturbed | = or > 150 acres | = or > 50 < 150 acres | = or > 20 < 50 acres | = or > 5 < 20 acres | = or > 1 < 5 acres | Subsequent coverage |
|---|---|---|---|---|---|---|
| Fee | $10,000 | $6,000 | $3,000 | $1,000 | $250 | $100 |

Who must submit the NOI form? All site operators must submit an NOI form. "Operator" for the purpose of this permit and in the context of SW associated with construction activity means any person associated with a construction project who meets either or both of the following two criteria: (1) The person has operational or design control over construction plans and specifications, including the ability to make modifications to those plans and specifications. This person is typically the owner or developer of the project or a portion of the project (e.g., subsequent builder), or the person that is the current land owner of the construction site, and is considered the primary permittee; or (2) The person has day-to-day operational control of those activities at a project which are necessary to ensure compliance with a SWPPP for the site or other permit conditions. This person is typically a contractor or a commercial builder who is hired by the primary permittee, and is considered a secondary permittee.

Owners, developers and all contractors that meet the definition of the operator in subsection 2.2 of the permit shall apply for permit coverage on the same NOI, insofar as possible. After permit coverage has been granted to the initial site-wide primary permittee, any subsequent NOI submittals must include the site's previously assigned permit tracking number and the project name. The comprehensive site-specific SWPPP shall be prepared in accordance with the requirements of part 3 of the permit and must be submitted with the NOI unless the NOI being submitted is to add a subsequent permittee to an existing coverage. **Artificial entities (e.g., corporations or partnerships) must submit the correct Tennessee Secretary of State, Division of Business Services, control number. General partnerships. For general partnerships, the NOI must be signed by each general partner in the general partnership.**

**The NOI will be considered incomplete without a correct control number, and the division reserves the right to deny coverage to artificial entities that are not properly registered and in good standing with the Tennessee Secretary of State (i.e., listed with an entity status of "active"). The division further reserves the right to issue permit coverage in the correct legal name of the individual or entity seeking coverage and to name each general partner of a general partnership in addition to the general partnership.**

Complete the form: Type or print clearly. Answer each item or enter "NA," for not applicable. If you need additional space, attach a separate piece of paper to the NOI form. **The NOI will be considered incomplete without a permit fee and comprehensive site-specific SWPPP (if applicable).**

Describe and locate the project: Use the legal or official name of the construction site. If a construction site lacks street name or route number, give the most accurate information available to describe the location (reference to adjacent highways, roads and structures; eg., intersection of state highways 70 and 100). Latitude and longitude (in decimal degrees) can be found at numerous other web sites. Attach a copy of a map, showing location of site, with boundaries at least one mile outside the site boundaries. Provide estimated starting date of clearing activities and completion date of the project, and an estimate of the number of acres of the site on which soil will be disturbed, including borrow areas, fill areas, stockpiles and the total acres. For linear projects, give location at each end of the construction area.

Name of the receiving waters: Trace the route of stormwater runoff from the site and determine the name of the water course(s) into which the runoff drains. Note that the water course may or may not be located on the construction site. If the first water body receiving construction site runoff is unnamed ("unnamed tributary"), determine the name of the waterbody that the unnamed tributary enters.

An ARAP may be required: **If your work will disturb or cause alterations of a stream or wetland, you must obtain an appropriate Aquatic Resource Alteration Permit (ARAP).** If wetlands are located on-site and may be impacted, attach the wetland delineation report. If you have a question about the ARAP program, contact your local Field Office (EFO).

Submitting the form and obtaining more information: Note that this form must be signed by the company President, Vice-President, or a ranking elected official in the case of a municipality, for details see subpart 2.5. For more information, contact your local EFO at the toll-free number 1-888-891-8332 (TDEC). Submit the completed NOI form (keep a copy for your records) to the appropriate EFO for the county(ies) where the construction activity is located, addressed to **Attention: Stormwater NOI Processing**.

Notice of Coverage: The division will review NOIs for completeness and accuracy and issue an NOC to site-wide primary operators, authorizing SW discharge from the construction site as of the effective date of the NOC. New subsequent operators will not receive an NOC, but are considered covered under the permit when their permit record is published on TDEC's dataviewer as "active" and with an effective date. TDEC Permit Dataviewer can be found at: http://environment-online.tn.gov:8080/pls/enf_reports/f?p=9034:34001:0

| EFO | Street Address | Zip Code | EFO | Street Address | Zip Code |
|---|---|---|---|---|---|
| Memphis | 8383 Wolf Lake Drive, Bartlett | 38133-4119 | Cookeville | 1221 South Willow Ave. | 38506 |
| Jackson | 1625 Hollywood Drive | 38305-4316 | Chattanooga | 1301 Riverfront Pkwy, Suite 206 | 37402 |
| Nashville | 711 R S Gass Boulevard | 37243 | Knoxville | 3711 Middlebrook Pike | 37921 |
| Columbia | 1421 Hampshire Pike | 38401 | Johnson City | 2305 Silverdale Road | 37601 |





# EXHIBIT J

# EXHIBIT K


going to be taken and dozed down, yet failed to tell the owners.

What connections does the mayor and/or any city officials have to the owners of the campground? The road was abruptly changed to go through the private property of a family that had purchased and had conducted 9 months of work on said house. So again I ask, what motivated the mayor and city officials to quickly chan... See more

1d    Like                                    5 

 **Lisa Armstead**
July 6th. Post have been deleted again. I am screen recording where we are at tor. ht. All the omment about the mayor and his brother have been deleted. Several told about the mayor and brother owning the campground, I do have screen recording of all the comments.

The mayor or whomever is controlling his page are violating the 1st amendment rights, they CANNOT delete comments. Keep in mind, SCOTUS has already ruled on this.

Screen recording 9:21 PM.

16h    Like

 **Mayor David Wear, City of Pigeon Forge** limited who can comment on this post.



**Mayor David Wear, City of Pigeon Forge**

May 27 · 🌐

~~failed to tell the owners.~~

What connections does the mayor and/or any city officials have to the owners of the campground? The road was abruptly changed to go through the private property of a family that had purchased and had conducted 9 months of work on said house. So again I ask, what motivated the mayor and city officials to quickly chan... See more

1d    Like    Reply                                         5 

    Write a reply...

 **Ava Marie Michels**
You are pure evil!
https://⸝utu.be/Y⸝⸝JvJ7dlQ
si=iMMwTNDm00NfnG3e

4d    Like    Reply                                    7 

Comment as Felicia Fifield        😊  GIF  🙂



 **Mayor David Wear, City of Pigeon Forge**
May 27 · 🌐



👍 Like　　◯ Comment　　◎ Send　　↗ Share

 **9**

Most relevant ⌄

**Felicia Fifield**
Where are the other 6 comments that have been deleted on this post? I hope you aren't illegally deleting comments.

1d　Like　Reply　　　　　　2 ⏱

Comment as Felicia Fifield　　　😍 GIF ☺





**Mayor David Wear, City of Pigeon Forge**
May 27 · 🌐

···

1d   Like   Reply                                    2 ⚙



**Felicia Fifield**
Why has the city not paid the homeowners who house you stole? And do not delete this comment, you are an elected official, this is a government page. It is against the law to delete comments or block the public from commenting on public platforms.

1d   Like   Reply                                    7 ⚙



**Lisa Armstead**
I just took a screenshot of this post with the above comment. This posts shows 8 comments, there is only two that has not been deleted. I will continue daily to check and record this page.

The city stole a home and has not paid the homeowners. The city knew this home was

Comment as Felicia Fifield          

# EXHIBIT L

contact me by email or phone.

Thank you,

David Wear

On Tue, Nov 28, 2023 at 10:04 AM Mika Race <mikarace@icloud.com> wrote:
> Hi Mayor Wear,
> We haven't heard back from our last email sent you. I'm just making sure you received it.
> Can you check where everything stands as of right now?
> 362 Ogle Dr

> Thank you,
> Mika Race & Doug Race

> Jeremiah 29:11

> > On Nov 14, 2023, at 2:36 PM, Mika Race <mikarace@icloud.com> wrote:
> >
> > Hi, Mayor Wears,
> > We gave our offer of just compensation as stated in our Constitution to the city. Our just compensation includes the property itself and the income that would have been generated in my lifetime. We never factored in the pain and suffering from stress this has caused us, but it should be considered in the negotiation process. The city declined our just compensation.
> > We did not consider "hit the city with the lottery," as you stated in our last conversation on 10/12, but the just compensation we rightly deserve.
> > I'm not sure where this is heading, but we will stay the course in which we firmly will stand our ground until all avenues have been exhausted. You had said during our first conversation back on 3-7-23 that you didn't want this to get sticky, and we do not want this either. Unfortunately, it looks like it might be heading that way. I'm confident that you can be the key to resolving this where all parties are satisfied.
> >
> > Thank you,
> > Mika Race
> >
> > Jeremiah 29:11
> >
> >


--
David Wear
865-659-9881

# EXHIBIT M

**IN THE CIRCUIT COURT FOR SEVIER COUNTY, TENNESSEE**

| | | |
|---|---|---|
| CITY OF PIGEON FORGE, TENNESSEE | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | No. 2024-cv-19IV |
| | ) | |
| MIKA RACE, et. al. | ) | |
| | ) | |
| Respondents. | ) | |

## MIKA RACE'S DECLARATION

1. My name is Mika Race, and I am over the age of 18 years old and have personal knowledge of the below.

2. On August 17, 2022, my husband, Doug Race, and myself closed on the property located at 362 Ogle Dr, Pigeon Forge, TN 37863. The property is zoned C-6 and is located within walking distance to the parkway in Pigeon Forge, Tennessee which is a major tourist attraction.

3. We closed at Smoky Mountain Title Company (hereinafter "SMTC") and purchased Title Insurance from Fidelity National Title Insurance Company (hereinafter the "Fidelity Policy"). Collective Exhibit A.

4. The property was in disrepair and to afford the needed repairs and upgrades we spent months traveling back and forth from our home and away from our businesses, which are both located in Chillicothe, Ohio, recruited family members to be our laborers and while it was exhausting, we also fell in love with the property and the residents of The City of Pigeon Forge.

5. On March 6, 2023, when we were at our property the neighbor approached my husband and myself and told us that our property was to be torn down for a road, and she felt bad because she had seen us fixing up the property for months.

6. My husband and myself immediately drove to the Pigeon Forge City Hall and spoke to Eric Brackins, Assistant City Manager, who confirmed this shocking information and that our property was to be condemned for the "West Side Connector" and that he had personally hung a door hanger on the previous owner's property. Further, Mr. Brackins told us that our "negotiator," Ed Crook of Crook & Company would be contacting us soon to start the *negotiation process*. Exhibit B.

7. On March 7, 2024, I spoke to the mayor of the City of Pigeon Forge, David Wear, and he confirmed that our property was to be condemned, and he had a home above us and also saw us working on the property for months but did not say anything.

8. We began to question why we did not have notice and why were they going to demo our property when their were three different *engineered designs* attending multiple City Commission Meetings.

9. In January of 2024, I was served with a lawsuit for a Petition of Condemnation from the private attorney Nathan D. Rowell. Exhibit F.

10. We called multiple law firms in Sevier County, Tennessee and could not find an attorney to represent us once they heard it was the City of Pigeon Forge.

11. We ended up hiring Michael Gault and Michael N. Wennerlund with the law firm of Bell Carrington Price & Gregg Attorneys At Law who advertises that their practice area includes Eminent Domain Law in North Carolina, South Carolina, Georgia, Tennessee, and Alabama. https://bellcarrington.com/condemnation/.

12. On March 25th, 2024, we met with both Mr. Gault, and Mr. Wennerlund both led us to believe we would be able to fight the eminent domain and that the City of Pigeon Forge did not have the right to take our property.

13. We also began to tell our story on various social media platforms including YouTube, Instagram, Facebook, and TikTok.

14. Mr. Gault began to call us and email us to tell us to stop speaking about our property, asking questions, and that Mr. Rowell was calling him.

15. On May 6, 2024, without our knowledge, Mr. Wennerlund signed an Agreed Order of Possession. <u>Exhibit G</u> . In fact, we did not find out about the Agreed Order until my husband asked the court's clerk to email us the order.

16. On June 26th, 2024, the neighbor called me to let me know our property was being bulldozed down. We were still paying the mortgage on the property and in order to preserve our credit we continued to pay the mortgage until just recently.

17. I understand that after being duly sworn and taking oath that the foregoing statements herein are subject to the penalties of perjury and are true and accurate to the best of my information, knowledge and belief.

FURTHER DECLARANT SAITH NOT.

_____
MIKA RACE
CO-PLAINTIFF/DECLARANT

# EXHIBIT N



**YEARS OF FORGING PROGRESS**

**PIGEON FORGE**
T·E·N·N·E·S·S·E·E

## Statement from Pigeon Forge City Manager Earlene Teaster
## July 11, 2024

Eminent domain is an unfortunate but necessary process. For eight months, the city of Pigeon Forge has been the subject of relentless accusations associated with a 1,047-square-foot commercial property, not a primary residence, located at 362 Ogle Dr. During this time, the City of Pigeon Forge has diligently attempted to reach a financial resolution with owners Doug and Mika Race by issue of just compensation.

For more than 30 years, the City of Pigeon Forge has worked toward providing Pigeon Forge residents with a much-needed alternative route to bypass Parkway traffic. To meet this need, the City Commission approved the building of the Westside Connector. To help determine its path in relation to Ogle Drive, residents were invited (via public media notices and individual door hangers placed on approximately 50 tracts) to attend a public meeting on Oct. 26, 2021. Based on public comments and the recommendations of the city's engineering firm, it was determined that in the best interest of Freedom Baptist Church and the Pigeon Forge Care and Rehabilitation Center nursing home, the Westside Connector's final route would travel through 362 Ogle Dr. The route was presented and approved in a Pigeon Forge City Commission meeting on Nov. 22, 2021.

On Aug. 17, 2022, the property at 362 Ogle Dr. was purchased by Doug and Mika Race of Chillicothe, Ohio, for $306,000 as an investment property, nine months after the Pigeon Forge City Commission approved the final Westside Connector route. Pigeon Forge city staff has been in ongoing discussions with the Races since March 2023 to negotiate the purchase of the property and provide compensation to the Races.

As part of this process, the property was appraised, as a commercial property, not a residential property, at a value of $489,665. To date, the Races have not submitted an alternate appraisal of the property. In an effort to provide compensation to the Races, in October 2023, the City offered $490,000, and the Races counter-offered with $3 million. The City countered with $539,000 (an offer that represents a value of $514 per square foot). The Races countered at $1.5 million. After 17 months, attempts to reach a financial resolution have proven unsuccessful and will be determined by court action. The City was sympathetic to the Races' financial obligations to the property, and in the interim (before work would begin on the Westside Connector in the Ogle Drive area), the Races could have offered the property as an overnight rental, as was their original intent, to derive and collect income from the property. The Races declined.

Since the Races elected not to utilize the property, the City elected to move forward with plans for the Westside Connector. On Jan. 12, 2024, the City of Pigeon Forge filed a petition for condemnation of the property at 362 Ogle Dr. At this time, the amount of damages, $490,000 (determined and equal to the appraised value), was deposited to the clerk of the court with this filing.

On March 16, the city attorney filed a notice of hearing to take place on May 6 in which a request for possession of the property was submitted. Late on May 3, via their attorney, the Races agreed to vacate the property, allowing the city to take ownership. The Races requested and received 30 days to vacate the property. The order of possession (dated May 6) was recorded on June 6, 2024, with the register of deeds.

On July 10, the city attorney received a motion to draw down funds on deposit for the court to pay off the Races' mortgage. The city has maintained it would not oppose the court clerk paying off the mortgage once it is instructed to do so by the court.

# EXHIBIT O





